Robert S. Green (SBN 136183)
James R. Noblin (SBN 114442)
**GREEN & NOBLIN, P.C.**
4500 East Pacific Coast Highway, Fourth Floor
Long Beach, California 90804
Telephone: (562) 391-2487
Facsimile: (415) 477-6710
-and-
2200 Larkspur Landing Circle, Suite 101
Larkspur, CA 94939
Telephone: (415) 477-6700
Email: gnecf@classcounsel.com
*Local Counsel for the Proposed Class*

Peter Safirstein (admitted *pro hac vice*)
**MORGAN & MORGAN, P.C.**
28 W. 44th St., Suite 2001
New York, NY 10036
Telephone: (212) 564-1637
Facsimile: (212) 564-1807
Email: psafirstein@MorganSecLaw.com
*Lead Counsel for the Proposed Class*

*[Additional counsel appear on signature page]*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT REED, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> AMIRA NATURE FOODS LTD., KARAN A. CHANANA, BRUCE C. WACHA, RITESH SUNEJA, ASHISH PODDAR, UBS SECURITIES LLC, DEUTSCHE BANK SECURITIES INC. JEFFERIES & COMPANY, INC., and KEYBANC CAPITAL MARKETS INC., <br><br> Defendants. | ) Master File Case No. <br> ) CV 15-0957 FMO (PJWx) <br> ) <br> ) <br> ) **CLASS ACTION** <br> ) <br> ) **SECOND AMENDED** <br> ) **COMPLAINT FOR** <br> ) **VIOLATIONS OF THE** <br> ) **FEDERAL SECURITIES LAWS** <br> ) <br> ) **JURY TRIAL DEMANDED** <br> ) <br> ) <br> ) <br> ) |

# TABLE OF CONTENTS

Page

I.   SUMMARY OF THE ACTION ................................................................ 2

II.   JURISDICTION AND VENUE ............................................................ 6

III.   PARTIES ........................................................................................... 7

IV.   SUBSTANTIVE ALLEGATIONS .................................................... 11

    A.   Background of the Company ................................................... 11

        1.   Amira's Industry and Corporate Structure ................... 11

        2.   Types of Reported Revenue .......................................... 13

    B.   The Basmati Rice Industry ...................................................... 15

        1.   Basmati Rice ................................................................. 15

        2.   Basmati Margins ........................................................... 16

        3.   Amira Export Data as Reported by the APEDA ........... 18

    C.   Interviews in the Two PPRG Reports Support the Allegations .... 21

    D.   Amira's Overstatement of Basmati Export Revenue ............... 30

    E.   Amira's Overstatement of Revenue from Sales in India .......... 37

    F.   Related Party Transactions ..................................................... 40

        1.   Karam Enterprises ........................................................ 40

        2.   Other Undisclosed Related Parties
            are Clients and Suppliers ............................................. 43

        3.   Amira's $30M Sham Real Estate Transaction ............... 46

    G.   Materially Untrue Statements and Omissions
        in the Offering Documents ..................................................... 49

    H.   Additional Materially False and Misleading Statements ......... 52

    I.   The Truth Begins to Emerge ................................................... 59

V.   CLASS ACTION ALLEGATIONS ................................................... 69

VI.   LOSS CAUSATION .......................................................................... 72

VII.   SCIENTER ALLEGATIONS ............................................................ 72

VIII.   APPLICABILITY OF PRESUMPTION OF RELIANCE
    THROUGH FRAUD-ON-THE-MARKET DOCTRINE ..................... 73

IX.   NO SAFE HARBOR .......................................................................... 74

X.   CAUSES OF ACTION ...................................................................... 75

    COUNT I
        Violations of Section 10(b) of the Exchange Act

and Rule 10b-5 Promulgated Thereunder
Against Amira and the Individual Defendants ................................... 75

COUNT II
    Violations of Section 20(a) of the Exchange Act
    Against the Individual Defendants ...................................................... 79

COUNT III
    Violations of Section 11 of the Securities Act
    Against Amira, Chanana, Suneja,
    and the Underwriter Defendants ......................................................... 80

COUNT IV
    Violations of Section 15 of the Securities Act
    Against Defendants Chanana and Suneja ........................................... 83

XI.    PRAYER FOR RELIEF ............................................................................. 85

Lead Plaintiff Steamfitters Local 449 Pension Plan ("Steamfitters Local 449" or "Plaintiff"), by and through their attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge.  Plaintiff's information and belief is based upon, among other things, counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Amira Nature Foods Ltd. ("Amira" or the "Company"), with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Amira; (c) two reports issued by Prescience Point Research Group; (d) discussions with Prescience Point Research Group;  (e) reports issued by the Credit Rating Information Services of India Limited ("CRISIL"); (f) export data from India's Agricultural and Processed Food Products Export Development Authority ("APEDA"); (g) interviews with former (non-controlling) Amira employees, APEDA employees, a banker that provides loans to Amira, individuals in the rice industry including Amira competitors, and individuals at the Food and Drug Administration: Center for Food Safety – Food and Cosmetics Information Center, the United States Department of Agriculture, and the U.S. Customs and Border Protection; and (h) review of other publicly available information concerning Amira.

## I.   SUMMARY OF THE ACTION

1.   This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired the securities of Amira pursuant and/or traceable to the Company's Registration Statement and Prospectus issued in connection with the Company's Initial Public Offering ("IPO") or purchased or otherwise acquired securities of Amira during the period between October 10, 2012 and August 20, 2015, inclusively ("Class Period"). Plaintiff seeks to recover damages caused by Defendants' violations of the Securities Exchange Act of 1934 (the "Exchange Act") and the Securities Act of 1933 (the "Securities Act").

2.   Amira is a global provider of packaged specialty rice, primarily Basmati rice which is a specialty long-grain rice grown only in certain regions of the Indian sub-continent.

3.   During the Class Period, Amira projected strong earnings and growth regarding the Company's Basmati rice sales.

4.   Unbeknownst to the investing public however, Amira's Basmati revenue was and is grossly overstated.

5.   On February 9, 2015, a third-party analyst firm, Prescience Point Research Group ("PPRG")[1], issued a report ("Report 1") (Ex. 1) exposing, among

---

[1] PPRG readily acknowledges that they have a short position in Amira and stands to gain if the stock declines.  However, they also state, "To the best of our ability and belief, as of the date hereof, all information contained herein is accurate and reliable

other things, the material overstatements of revenues and undisclosed related party transactions by Amira.

6. According to information that PPRG received from India's relevant government authority, APEDA, Amira exported only around $69 million of Basmati rice in the fiscal year ending March 31, 2013 ("FY'13") and only around $87 million of Basmati rice in the fiscal year ending March 31, 2014 ("FY'14"). PPRG reports that these amounts are in sharp contrast to the revenue information disclosed by the Company in Amira's SEC filings and believes in good faith that Amira's filings with the SEC overstate the Company's Basmati exports by approximately $100-$117 million in FY'13 and approximately $100 million in FY'14.

7. Moreover, Amira is listed by the APEDA as the fourteenth largest exporter of basmati rice in India. However PPRG's Report 1 contends, "Had Amira truly generated the revenue from Basmati exports it reported to US investors, it would  have been the 4th and 5th largest exporter of basmati rice in FY'13 and FY'14,  respectively...".

---

and does not omit to state material facts necessary to make the statements herein not misleading, and all information has been obtained from public sources we believe to be accurate and reliable...." PPRG has published investigative reports against several companies.  At least five of these companies have been the subject of class actions: A-Power Energy Generation Systems Ltd. (settled, delisted, SEC investigation), China Gerui Adv. Materials Grp. Ltd. (awaiting decision on MTD), Yongye Int'l. Inc. (voluntarily dismissed, co. went private), Boulder Brands, Inc. (LP papers filed, CEO resigned), and InnerWorkings, Inc. (awaiting decision on MTD).

8.     As summarized by PPRG in Report 1 (at pg. 5):

We have sourced official Indian government Basmati export data that proves [Amira] has overstated its international Basmati revenue. We estimate that [Amira] inflated this metric by approximately 145% in FY'13 and approximately 117% in FY'14, implying that in FY'14, approximately 19% of [Amira] consolidated sales were fabricated. We have also collected evidence indicating Amira is lying about its India Basmati revenue, which it tells US investors is derived wholly from the sale of branded product. Amira claimed approximately $224m in Indian Basmati revenue in FY'14; we estimate it actually generated approximately $38m, implying that another 34% of consolidated sales are fabricated. Over 50% of [Amira]'s consolidated revenue is suspect; that number could be larger, as we are giving the company full credit for its reported revenue from non-Basmati rice and other commodity products

9.     After the release of this information, on February 9, 2015, Amira stock closed at $9.95 per share, falling $3.45 per share or almost 26% from February 6, 2015 when the stock closed at $13.40 per share.  Several analysts cut their ratings for Amira following the PPRG revelations.

10.     Amira continued to make false and misleading statements reporting inaccurate financial results on March 2, 2015 and July 16, 2015.  The July 16, 2015 press release should have been accompanied by the Company's Form 20-F but was not.  On July 21, 2015, Amira's share price dropped over a dollar per share.

11.     On July 30, 2015, a second Amira report was published by PPRG ("Report 2", collectively with Report 1, "Reports") (Ex. 2).  Amira's share price fell another $1.07 per share on July 30, 2015.

12.     On August 3, 2015, Amira filed a Form 12b-25, Notification of Late Filing of the Company's 20-F, stating that Amira was unable to file its Annual Report on Form 20-F for the year ended March 31, 2015 on a timely basis "due to the Company requiring additional time to work internally with its staff and externally with its independent auditors to prepare and finalize the Annual Report."

13.     On this news, Amira's share price fell $3.25 per share.

14.     Moreover, as of the date of the filing of this Complaint, Amira has still not filed its Annual Report.

15.     On August 18, 2015, BMO cut its rating on Amira from Outperform to Market Perform.  The Amira stock price dropped $2.34 per share on this day.

16.     On August 19, 2015, after the close of trading, Amira issued a press release announcing that the Company had hired a new auditor and the Audit Committee of the Board of Directors of Amira had "elected to appoint an independent external investigative firm."

17.     The corresponding Form 6-K filed with the SEC revealed that the Company had terminated its auditor Deloitte Haskins & Sells LLP ("Deloitte") and instead engaged India-based ASA & Associates LLP.

18.     Deloitte had requested the Amira Audit Committee retain independent external forensic investigators to conduct an investigation into (i) the issues raised in a short seller report dated July 30, 2015 and (ii) other transactions identified by

Deloitte in connection with its incomplete audit of the Company's financial statements for the year ended March 31, 2015.

19.    On August 20, 2015, the Amira stock price dropped $1.81 per share.

20.    On August 21, 2015, despite having appointed an independent external investigative firm, Amira announced that the Company rejects the claims made by PPRG and remains confident in the previously announced financial results.

21.    On September 14, 2015, three weeks after terminating its auditor and starting an investigation, Amira announced that it expects to file its 20-F "as soon as practical." Amira's stock price closed at $3.97 per share on September 16, 2015 having traded at a high of $25.00 per share on February 21, 2014.

22.    The Company and the Individual Defendants (defined herein) made materially misleading statements, and/or failed to disclose material information necessary to make various statements not materially misleading.  As a result, the Amira shares were sold at artificially inflated prices.

## II.    JURISDICTION AND VENUE

23.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5] and under Sections 11 and 15 of the Securities Act, 15 U.S.C. §§ 77k and 77o, and the rules and regulations of the SEC promulgated thereunder.

24.    This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa], Section 22(a) of the Securities Act (15 U.S.C. § 77v(a)), and 28 U.S.C. § 1331.

25.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C., Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a) and § 1391(b) as Amira conducts substantial business in this District and has an office located in this District at One Park Plaza, Suite 600, Irvine, California, 92614.

26.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the New York Stock Exchange ("NYSE").

III.    **PARTIES**

27.    Plaintiff purchased Amira securities during the Class Period, and suffered damages as a result of the federal securities law violations and materially false and misleading statements and/or material omissions alleged herein.

28.    Defendant Amira is a British Virgin Islands Corporation with its principal executive offices located in Dubai, United Arab Emirates.  Amira has an office in this District at One Park Plaza, Suite 600, Irvine, California, 92614. Amira processes, markets, and sells rice and other food products.   The Company's predominant product is Indian Basmati rice.  On or about October 10, 2012, Amira

conducted its IPO, in which it issued 9 million ordinary shares to the public generating total proceeds of $90 million.  The IPO was conducted pursuant to several documents that were filed with the SEC and disseminated to the investing public, including: (i) Amira's Registration Statement dated August 29, 2012 and filed with the SEC on Form F-1, as amended by four subsequent amendments, which contained versions of the prospectus (the "Registration Statement"); and (ii) the final prospectus, which is part of the Registration Statement and was filed with the SEC on October 11, 2012 on Form 424(b)(4) (the "Prospectus").  The Registration Statement was declared effective by the SEC on October 10, 2012.  Amira shares trade on the NYSE under the ticker "ANFI."

29.   Defendant Karan A. Chanana ("Chanana") was, at all relevant times, Chief Executive Officer ("CEO") and Chairman of the Board of Directors of Amira. Chanana signed the Registration Statement filed with the SEC on August 29, 2012 and all subsequent amendments.  Because of his senior position within and control of the Company, Chanana possessed the power and authority to control the contents of the Registration Statement and Prospectus, Amira's press releases, investor and media presentations, and other SEC filings.

30.   Defendant Bruce C. Wacha ("Wacha") became Chief Financial Officer ("CFO") of Amira on June 2, 2014 and has served in that capacity throughout the Class Period. He is also Principal Accounting Officer, and Executive Director of Amira.

31.     Defendant Ritesh Suneja ("Suneja") was CFO of Amira from the beginning of the Class Period until resignation in November 20, 2012.  Suneja signed the Registration Statement filed with the SEC on August 29, 2012 and all subsequent amendments.  Because of his senior position within and control of the Company, Suneja possessed the power and authority to control the contents of the Registration Statement and Prospectus, Amira's press releases, investor and media presentations, and other SEC filings.

32.     Defendant Ashish Poddar ("Poddar") was CFO of Amira from November 11, 2012 until he resigned his CFO position on May 1, 2014.  He is currently an Executive Director of Finance at Amira India.

33.     Collectively, Defendants Chanana, Wacha, Suneja, and Poddar are the "Individual Defendants".

34.     UBS Securities LLC ("UBS") was a lead underwriter and co-lead book-running manager of the IPO, selling 4,117,500 shares of common stock in the IPO.

35.     Deutsche Bank Securities Inc. ("Deutsche Bank') was a co-lead underwriter and co-lead book-running manager of the IPO, selling 3,397,500 shares of common stock in the IPO.

36.     Jefferies & Company, Inc. ("Jefferies") was an underwriter of the IPO, selling 900,000 shares of common stock in the IPO.

37.     KeyBanc Capital Markets Inc. ("KeyBanc") was an underwriter of the IPO, selling 585,000 shares of common stock in the IPO.

38.     Collectively, UBS, Deutsche Bank, Jeffries, and KeyBanc are the "Underwriter Defendants."

39.     Collectively, Amira, the Individual Defendants, and the Underwriter Defendants are the "Defendants" or "Amira Defendants."

40.     During the Class Period, the Defendants were privy to material non-public information concerning the Company's business, finances, products, markets, and present and future business prospects, via access to internal corporate documents, conversations and connections. Because of possession of such information, the Defendants knew or recklessly disregarded the fact that the materially adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

41.     Defendants had access to the materially adverse undisclosed information about the Company's business, operations, related party transactions, financial statements, markets and present and future business prospects via access to internal corporate documents and via reports and other information provided in connection therewith.

42.     Throughout the Class Period, the Defendants were able to control the content of the various SEC filings, press releases and other public statements pertaining to the Company.  The Defendants had access to the documents alleged herein to be materially misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or to cause them to be

corrected. Accordingly, the Defendants are responsible for the accuracy of the public reports and press releases detailed herein, and are therefore primarily liable for the representations contained therein.

## IV.   SUBSTANTIVE ALLEGATIONS

### A.   Background of the Company

#### 1.   Amira's Industry and Corporate Structure

43.   Amira produces branded packaged Indian specialty rice and other related rice based products.  The majority of the Company's revenue is generated through the sale of Basmati rice, a premium long-grain variety of rice grown only in certain regions of the Indian sub-continent, under the Amira brand, as well as under other third party brands.  Other Amira branded products include snacks, ready-to-heat meals, and a line of organic product offerings.

44.   In fiscal years 2012 through 2014, the Company generated over half of its yearly revenue outside India.  Amira currently has international operations in Malaysia, Singapore, United Arab Emirates ("UAE"), the United Kingdom, the United States, and Germany.  The Company sells products to customers in over 60 countries with a significant portion of international sales going to Asia Pacific; Europe, the Middle East and Africa ("EMEA"); and North America.

45.   As of March 31, 2014, Amira employed 478 persons (including 36 employees in locations outside of India).

46.    Amira is a British Virgin Islands holding company which owns a holding company in Mauritius (Amira Nature Foods Ltd. or "Amira Mauritius"), that in turn holds an operating subsidiary in India, Amira Pure Foods Private Ltd. ("Amira Pure Foods"), Amira's sole India-based subsidiary. Amira Pure Foods is Amira's primary operating subsidiary and Amira's only subsidiary which processes Indian specialty rice (including Basmati).

47.    Amira's corporate structure as of March 31, 2014 is illustrated by the following diagram reported in Amira's Form 20-F for the fiscal year 2014, filed with the SEC on July 28, 2014 ("2014 20-F"):



*(1) Assumes the completion of the purchase by Mr. Karan A. Chanana of 1,500,000 equity shares of Amira India.*

*(2) Includes Share options granted and vested till March 31, 2014.*

*(3) International subsidiaries are:*

> • *Amira I Grand Foods Inc.*
> • *Amira Food Pte. Ltd. (Singapore)*
> • *Amira C Foods International DMCC (UAE)*
> • *Amira Foods (Malaysia) SDN. BHD.*
> • *Basmati Rice GmbH (Germany)*
> • *Basmati Rice North America LLC (U.S.)*
> • *Amira G Foods Limited (U.K.)*
> • *Amira Ten Nigeria Limited*

48.    Amira operates a single processing and packaging facility in Gurgaon, near New Delhi, India.  The facility has processing capacity of approximately 24 metric tons of paddy per hour.  Amira has also secured 48.2 acres in nearby Haryana, India and has begun construction of a new processing plant which is expected to increase the Company's production capacity to more than 60 metric tons per hour.

**2.    Types of Reported Revenue**

49.    Amira reports revenue from the following segments:

•    <u>Amira Branded Products</u>: several rice varieties (premium and "value" basmati rice and non-basmati rice), as well as a line of products including ready to eat snacks, ready to heat meals, edible oil, dairy products, and organics.  According to the Company's 2014 20-F, in FY'14 Amira branded sales increased by $47 million, or 24.5% to $238.8 million ($191.8 million in 2013).

•    <u>Third Party Branded Products</u>:  a number of varieties of Basmati and non-Basmati packaged rice sold to many large international and regional customers, such as Euricom Spa, Indonesia's Business State Logistics Agency (Bulog),

Platinum Corp. FZE, and the Seychelles State Trading Corporation Limited, who market them under their own brand through their own distribution networks. According to the Company's 2014 20-F, in FY'14 third party branded sales increased by $24.7 million, or 11.5% to $239.1 million ($214.4 million in 2013).

- Institutional Business: primarily consists of the opportunistic sale of bulk commodities, including: wheat, barley, legume, maize, sugar, soybean meal, onion, potato and millet – sold to large international and regional trading firms. Sales of bulk commodity products to Amira's institutional customers contributed 1.8% of Amira's total revenue, or $7,446,600 in 2013.

50.     Amira also separately reports the revenue from international sales and from sales in India.  According to the Company's 2014 20-F, in fiscal years 2014, 2013 and 2012, Amira's revenue from international sales was $323.2 million, $224.8 million and $217.0 million, respectively.

51.     In India, the Company primarily sells Basmati rice and other packaged foods under the Amira brand name. According to the Company's 2014 20-F, revenue in India was $224.1 million in FY'14, an increase $35.2 million or 18.6% compared to $188.9 million in FY'13.

52.     In addition, Amira reports the percentage of Company revenue derived from sales of Basmati rice overall although the Company does not provide additional details, such as the breakdown between international verses India sales, within the Basmati segment.  According to the Company's 2014 20-F, in fiscal 2014 and 2013,

Amira derived 65.2% and 76.1% of the Company's revenue, respectively, from sales of Basmati rice ($356.8 million in 2014 and $314.8 million in 2013).

**B.    The Basmati Rice Industry**

    **1.    Basmati Rice**

53.    The global rice market represented approximately $276 billion in value, according to statistics from the Food and Agricultural Organization of the United Nations, based on benchmark rice export prices for the international rice trade. The Indian rice industry was valued at approximately $50 billion in wholesale prices in fiscal 2013, within which the Indian Basmati rice was valued at approximately $4.2 billion, according to the Credit Rating Information Services of India Limited ("CRISIL") Research Report on the Indian Rice Industry[2].

54.    Basmati rice has historically only been grown successfully in certain states in North India and in a part of the Punjab region located in Pakistan – all regions with a climate conducive to growing Basmati rice.

55.    Amira utilizes agents known as "pucca artiyas" who are authorized to make purchases of Basmati paddy (rough, unprocessed Basmati rice) in the organized and government-regulated agricultural produce markets in India known as "mandis."

---

[2] 2014 20-F, p. 24.

56.     The Basmati rice industry is cyclical and is dependent on the results of the Basmati paddy harvest, which occurs for only seven months in the year (September to March).

### 2.     Basmati Margins

57.     A unique feature of Basmati rice is that its quality is perceived to improve with age. Amira reports that its Basmati rice is sold at least 10 to 12 months after harvesting and generally commands a price premium. As a result, Amira typically allows their Basmati paddy to age from six to eight months and their processed Basmati rice to age for an additional four to six months before selling it. If there is any fall in the price of Basmati rice during the time it is held for aging, Amira may not be able to recover, or generate the same margins from, the investment in Basmati paddy or processed rice.

58.     Pricing data is readily available for both paddy and finished Basmati. NNS Grains publishes indices for each that can easily be tracked by using a Bloomberg terminal. The paddy price can be found under "ATARBASM Index", and the wholesale Basmati price can be found under "KAGRBARI Index".

59.     According to PPRG, the Basmati realization spread has had a sustained decline.   In the 2 quarters prior to the PPRG Report 1, the spread collapsed, contracting to multi-year lows in December 2014. The Basmati spread is the single most impactful driver of Amira's profitability.   Basmati sales made up 62.5% of

Amira's revenue in FY'14, and the Basmati margin outweighs the margin on other products by approximately 2x.

60.   After harvest, the paddy is transported to a processing facility, pre-cleaned and dried. After it has been dried, some of it is parboiled to improve the nutritional profile of Basmati rice, causing it to retain more nutrients than regular milled Basmati rice, and changes its texture so that it has a fluffier consistency. After it has been dried, and where appropriate, parboiled, it is stored and aged.  Prior to further processing, the paddy is cleaned again and then milled using a rice huller to remove the paddy's outer and inner husk. Once the husk has been removed, the resulting rice is polished and the broken rice is removed and retained. Amira sells broken Basmati rice as Amira branded "Every Day" Basmati rice at an economical price compared to full grain Basmati rice.

61.   Amira's business requires a significant amount of working capital primarily due to the fact that such a large amount of time passes between the purchase of Basmati paddy and the sale of finished Basmati rice. Accordingly, Amira needs to maintain substantial levels of working capital and consequently borrows money which the Company secures with inventory.

62.   Amira also procures semi-processed rice through vendors. Vendors or suppliers are millers who have bought and aged non-Basmati rice.  Amira purchases the semi-processed rice, transports the product to the Company's rice mill and then finishes, packs, and sells the product.

### 3.   Amira Export Data as Reported by the APEDA

63.   Utilizing the Right to Information Act, PPRG was able to source summary export data for Basmati rice for periods corresponding to Amira's FY'13 and FY'14 from the APEDA.

64.   APEDA is the governing body overseeing agricultural exports in India; it is the sole regulator responsible for registering exporters, issuing licenses and ensuring product quality.

65.   Exporters that wish to export must register with APEDA,[3] upon which time they receive a registration number, or RCMC. In addition, all exporters of Basmati rice have to obtain an Allocation Certificate ("RCAC") from APEDA.  Any exporter who wants to obtain an RCAC (an allotment for the quantity to be exported) must submit an executed export contract. An export contract represents a sale deed or other document reflecting transfer of title to goods to a party outside India. Without an RCAC no shipment can leave the port.

66.   APEDA keeps record of all Basmati exports and compiles relevant statistics. APEDA records the export in the name of the exporter who holds the RCAC and ships in its own name.  Also, APEDA captures the Free on Board

---

[3] *See* APEDA Act, Section 12, available at http://apeda.gov.in/apedawebsite/corporate_info/APEDA-Act-As-on-date.pdf.

("FOB") value of Basmati exported.  FOB value, as per the India's Customs Act[4] represents the sale value or market value of goods of Basmati as it leaves port.

67.    The value of Basmati FOB on a ship leaving India should closely correspond with revenue generated when it is later sold on the international market.

68.    The below tables from APEDA rank the top 20 Indian exporters of Basmati by export volume and includes export turnover data for these companies. In the case of Amira, the APEDA data tells a very different story than the SEC filings.



**APEDA FY'13 and FY'14 Ranking of India's Top 20 Basmati Exporters by Volume**

Top 20 Exporter(s) of Basmati Rice from 01/04/2012 To 31/03/2013

| S.No. | Exporter Name | Qantity (In MT) | Total FOB (In USD) | Avg. Price | Total RCAC |
|---|---|---|---|---|---|
| 1 | K.S. AGRO EXPORTS | 260799.288 | 294671234.60 | 1129.88 | 577 |
| 2 | D.D. INTERNATIONAL PVT. LTD. | 206560.160 | 213079406.28 | 1031.56 | 395 |
| 3 | BEST FOODS LIMITED | 184017.891 | 200447084.35 | 1089.28 | 252 |
| 4 | SUNSTAR OVERSEAS LTD. | 160297.790 | 154833383.97 | 965.91 | 512 |
| 5 | SHRI LAL MAHAL LIMITED | 143851.999 | 176536364.76 | 1227.21 | 240 |
| 6 | KRBL LIMITED | 132188.485 | 158398657.73 | 1198.28 | 575 |
| 7 | KOHINOOR FOODS LTD. (FORMERLY SATNAM OVERSEAS LTD.) | 94182.505 | 95293021.10 | 1011.79 | 534 |
| 8 | L.T. FOODS LTD. | 91091.457 | 96890509.87 | 1063.66 | 620 |
| 9 | DUNAR FOODS LIMITED | 88502.174 | 83305690.22 | 941.28 | 334 |
| 10 | GOEL INTERNATIONAL PVT. LTD. | 85353.430 | 86753871.47 | 1016.41 | 94 |
| 11 | TANNA AGRO IMPEX PVT. LTD. | 74756.000 | 92200878.33 | 1233.36 | 45 |
| 12 | AMIRCHAND JAGDISH KUMAR (EXPORTS) LTD. | 73088.440 | 74915375.95 | 1025.00 | 288 |
| 13 | SSA INTERNATIONAL LTD. | 69497.729 | 70386626.92 | 1011.35 | 315 |
| 14 | AMIRA PURE FOODS PVT LIMITED | 68458.233 | 68581553.85 | 1173.17 | 134 |
| 15 | VEER OVERSEAS LTD. | 57269.830 | 59514722.20 | 1039.20 | 137 |
| 16 | BUSH FOODS OVERSEAS PRIVATE LIMITED | 56931.000 | 56092922.00 | 985.28 | 781 |
| 17 | SANTOSH OVERSEAS LIMITED | 55553.186 | 52215407.50 | 939.92 | 229 |
| 18 | AL GYAS EXPORTS PVT LTD | 47486.950 | 39660536.00 | 835.50 | 62 |
| 19 | DRRK FOODS PRIVATE LIMITED | 42401.000 | 36002200.00 | 849.99 | 68 |
| 20 | SHREE JAGDAMBA AGRICO EXPORTS PVT. LTD | 41873.000 | 46443456.17 | 1109.15 | 65 |
|  | Total | 2024142.547 | 2156122793.27 | 20876.98 | 6157 |

Top 20 Exporter(s) of Basmati Rice from 01/04/2013 To 31/03/2014

| S.No. | Exporter Name | Qantity (In MT) | Total FOB (In USD) | Avg. Price | Total RCAC |
|---|---|---|---|---|---|
| 1 | K.S. AGRO EXPORTS | 426487.310 | 740609530.00 | 1736.53 | 839 |
| 2 | D.D. INTERNATIONAL PVT. LTD. | 215712.434 | 298916339.45 | 1385.72 | 596 |
| 3 | BEST FOODS LIMITED | 182832.778 | 301986751.45 | 1651.71 | 263 |
| 4 | AMIRCHAND JAGDISH KUMAR (EXPORTS) LTD. | 142575.332 | 193087865.03 | 1354.29 | 299 |
| 5 | SUNSTAR OVERSEAS LTD. | 129893.569 | 174406515.76 | 1342.69 | 705 |
| 6 | KRBL LIMITED | 108344.651 | 174218630.92 | 1608.00 | 724 |
| 7 | SSA INTERNATIONAL LTD. | 104748.182 | 143391453.14 | 1368.92 | 633 |
| 8 | GOEL INTERNATIONAL PVT. LTD. | 100841.685 | 154859617.90 | 1535.67 | 122 |
| 9 | L.T. FOODS LTD. | 92190.427 | 123572311.99 | 1340.40 | 834 |
| 10 | KOHINOOR FOODS LTD. (FORMERLY SATNAM OVERSEAS LTD.) | 85480.391 | 111513435.63 | 1304.55 | 537 |
| 11 | SHIV SHAKTI INTER GLOBE EXPORTS PVT. LTD. | 72548.928 | 148599708.91 | 2048.27 | 117 |
| 12 | SHRI LAL MAHAL LIMITED | 71623.676 | 86092946.89 | 1202.02 | 274 |
| 13 | DUNAR FOODS LIMITED | 64012.056 | | 1218.14 | 473 |
| 14 | AMIRA PURE FOODS PVT LIMITED | 63405.968 | 87365723.86 | 1377.88 | 222 |
| 15 | BUSH FOODS OVERSEAS LIMITED | 56860.000 | 76329530.00 | 1342.24 | 44 |
| 16 | SANTOSH OVERSEAS LIMITED | 55810.500 | 72328348.00 | 1295.96 | 266 |
| 17 | TANNA AGRO IMPEX PVT. LTD. | 54108.550 | 85028789.03 | 1571.59 | 24 |
| 18 | VEER OVERSEAS LTD., | 53922.000 | 78762720.20 | 1460.68 | 168 |
| 19 | SHREE JAGDAMBA AGRICO EXPORTS PVT. LTD | 50567.000 | 67034240.05 | 1325.65 | 44 |
| 20 | SHAKTI BHOG FOODS LTD. | 49167.052 | 61278379.61 | 1246.33 | 213 |
|  | Total | 2181127.593 | 3257348550.84 | 28717.24 | 7397 |

According to APEDA, Amira Pure Foods is India's 14th largest exporter of basmati rice, having generated basmati export turnover of ~$68.6m in FY'13 and ~$87.4m in FY'14.

---

[4] Customs Act, 1962, Section 14 specifies that, "For the purposes of the Customs Tariff Act… or any other law for the time being in force, the value of… export goods shall be the transaction value… that is to say, the price actually paid or payable for the goods when sold… for delivery at the time and place of exportation"

69.     All Basmati sold internationally by Amira is sourced from and exported by Amira India.  As a result, the export value of all Amira's international Basmati sales should be reflected in the name of Amira Pure Foods (Amira India), as per APEDA data.

70.     It is possible that Amira performs incremental value-added activities outside of India pertaining to final finishing and/or packaging of exported Basmati product, then sells the finished Basmati at a higher price (than the export price). In such case, APEDA Basmati export data will reflect a slightly lower value than international Basmati sales bookable by a consolidated Amira; however, the variance from the APEDA data would be minimal.

71.     Since FOB value represents the sale value at the time of exportation and most of the value add is in the processing of Basmati, even if Amira adds incremental margin via its international subsidiaries, the Company's reported international Basmati sales would still very closely tie up in value with the APEDA export data for Amira Pure Foods.

72.     Given that all Basmati product passes through Amira India's facility, the variance on account of differences in sales prices booked by Amira's international subsidiaries and Amira India (on the export) cannot be significant.  On this basis, the sizeable variance of approximately 117% (as calculated by PPRG) between Amira's FY'14 estimated international Basmati sales and export data on record with APEDA cannot be not justified.

### C.   Interviews in the Two PPRG Reports Support the Allegations

73.   As discussed, PPRG has published two reports on Amira.  Both contain a significant amount of detail including transcriptions of conversations with former Amira employees.

74.   Although not all the witnesses are identified by name, the quoted witnesses on which PPRG relies are identified at a minimum by occupation and thus with sufficient particularity to support the probability that the people in the positions occupied by the sources would possess the information alleged.

75.   PPRG includes transcriptions of conversations with a former Amira CFO ("CFO1"), a Former Amira Audit Committee member, the CFO of a competitor company (KRBL), and Rahul Nayar ("Nayar") who is Defendant Chanana's brother-in-law and a former UBS banker who administered Amira's IPO and was paid a fee of 2% of the total size of the IPO (approx. $2 million),[5] and who was Amira's Director of Global Communications and Strategy from October 2012 to March 2013.

---

[5] The Company's IPO Prospectus, filed with the SEC on October 11, 2012, states that, in connection with the engagement of Nayar as Amira's Director of Global Communications and Strategy and for similar services rendered in connection with the IPO and Amira's corporate reorganization, Shree Capital Advisors Ltd. will receive a fee of 2% of the total size of this offering, plus the reimbursement of expenses, upon completion of the offering.  Nayar is the managing director of Shree Capital Advisors Ltd. (Prospectus, pg. 104, Form 424B4 filed with the SEC on Oct. 11, 2011, available at http://www.sec.gov/Archives/edgar/data/1552448/000104746912009453/a2211335z424b4.htm.)

76.     Report 1's transcript of a conversation with CFO1 states:

> PP: What are your thoughts on these [claims as relayed to us]?
>
> **CFO1**: I'll say that they are right, including the personal behavior of Karan Chanana. That' [sic] is very much right.
>
> PP: Very much right…? What about the claims of inflating turnover by 25% to 30%, and that Amira must also be inflating [its turnover]?
>
> CFO1: Yes, that is very much true, and that's something that the industry does and, unfortunately for the domestic part of their lending, the IPO money will come in but they'll still be accessing domestic funds to fund their working capital. Some of the banks already know about it and they do … let's say for inventory, let's say, that they have 50 million inventory, they get financing of at least 25% extra. That's because they inflate that inventory number and that is an industry practice…
>
> PP: Got it. And again, the junior executive with the export team, he said Amira has a host of companies in its group that deal among themselves, as well as third parties. The source, he felt that it was difficult to keep track of the transactions within the group. Is that how it's inflating its turnover? Is that how it's done?
>
> CFO1: Yes, that is how use this to work on numbers, **as well as transferring funds across businesses for use for a particular purpose**…

- Ex.1, Report 1, pg. 21, emphasis added.

77.     More of this conversation with CFO1 is included in Report 2, which, in addition to the above transcription excerpt, states:

> PP: We've identified many, many other companies that seem to be based in Amira's corporate headquarters or share its registered address. How are we to think about that?
>
> CFO1: This is typical of an Indian company, where they try to open up new company setups for various reasons. One is sometimes to have related party transactions to show loss in one entity and profit in another entity… I would say that it is more of a deliberate attempt to – not specific to Amira, but sometimes a lot

of companies do that – and then they try to open up these separate entities to either continue doing business [via the new entity], and have the 'real' company close down sometimes. So that's a very typical kind of way which some of them are involved with themselves.

PP: Could this be a deliberate attempt to manipulate the financial statements?

CFO1: **To manipulate the routing of funds… So it is their method of moving funds around… If you look at it purely from a transfer pricing perspective, that is where they can mess around**. That's how they work around. How you build arm's length transactions is very important definition there, and so how you build the transfer pricing mechanism. So [they can play with] that particular stuff, an auditor can do a [check showing that something] is not right, but if he's not sure, then he will say, "Okay fine. I'm not so sure about that." So that's how it'll work out. It's an area of gray, not white or black so that is how they will try to structure those transactions.

- Ex. 2, Report 2, pg. 10, emphasis added.

78.     Both Reports also include excerpts of an interview with Nayar.   In Report 1, PPRG included an excerpt of the conversation with Nayar concerning the size of Amira's branded sales both in India and internationally.   Nayar draws a distinction between selling retail and selling wholesale and indicates that Amira's branded retail sales are quite small. The transcription excerpt reports in part:

Rahul Nayar: So he was trying to build a brand but in the interim, you know, building a brand is not easy and as we discussed on the road at that time, 90% of sales in India don't take place in fancy supermarkets. They take place in small Mom and-Pop stores and so it's hard to build a brand in those places.

His goal is to build a brand but yes, this is not a branded company yet. It is not spin; it is a fact but it's still a very small portion, I mean, very small portion of the overall business, tiny portion but the goal is to build it big. But in the meantime, you know, Wall

Street likes growth and everybody has forgotten to ask the brand question and is just focused on the top line revenue growth numbers.

…

in the US and the republic, as long as you show good revenue growth, you know, no one bothers you until you go south, right?

\* \* \*

But I think, you know, the heart of the question is how much is sold retail and how much is sold wholesale, right?

You know, third party versus, you know … Amira brand, you notice Amira brand overseas is a tiny, tiny number. It must be a 3% or 4% or 5% number. I don't know, you've got to get the most latest filings, I have no idea. But I think that's a very small number and I think that's what the branded business … you know, they're kind of trying to grow that.

- Ex. 1, Report 1, pg. 14.

79.   In Report 2, PPRG included an excerpt of the conversation with Nayar concerning fake sales, inflated revenue from circular sales, lack of independence regarding both clients and providers (of rice), and a stunning lack of disclosures on volume.  The transcription excerpt reports in part:

PP: We've spoken to a lot of people on the ground [in India], tried to survey the industry to get to know it better. [We spoke with many] experts, other exporters, etc. They [all] seem to say it's common for companies in this business to inflate their turnover 25% to 30%. [Doing so] is necessary, they say, to obtain adequate financing. Most of the exporters, they say, are pretty stretched financially and so it's common practice that that's done. Is that your general experience as well?

RN: … at the end of the day, I think investors should definitely spend more time looking at the top 12--15 clients, right, and how those contracts were won, you know, with Kuwait and Saudi and other places they go to because it's a bidding process and how they won. Who are your top 15 clients? And in the same way, because what you are implying is that **they sell to somebody, which is a**

**fake sale and that guy in the future sells it back to them** or something like that, right? So I think if you look at the top 10-20 clients of the company and then look at the top 10-20 providers of product, and make sure they are independent, that should either give you a good or bad answer, I would think. And I don't think people have asked.

PP: Yes, I don't think Amira discloses this type of information to its investors.

RN: … you know in the US the [investing] public, as long as you show good revenue growth, you know, no one bothers you until you go south, right?

PP: Sure, nobody bothers you.

RN: So I think that's an area for sure, where people should spend some time and get comfortable or not as to **who the customers are, how the contract's won, you know, are these guys independent**? If not, what is the size of the business, right? Are these clients big or small compared to what they're buying from the company? All that stuff, I think people have done, even the analysts have done, you know, zero job on, zero.

PP: I think … so basically, what you're saying is figure out who the top customers are and then …

RN: Yes, look, I'm answering your question and I'm saying I [thought] that too for Indian rice companies, right? How do they do it? **I mean, are they over-invoiced or they sell to somebody else and you know, stuff it in the channels and get it back later. You buy it back later, you know, you sell something and buy it back, and sell something again. You have this kind of virtuous circle**.

But I'm saying the only way you can know whether that's true or not is to look at the top 20 customers, right? Because, I mean, at the end of the day, the top 20 customers' sales need to match to the overall sales, or at least a large part of your overall sales, right?

PP: Yes, they're definitely not disclosing that, the top 20.

RN: On an annual basis, they've got to. I know the IPO, they did. If you look at the IPO prospectus, it's in there.

PP: They absolutely do not. They do not disclose the names of the top 20 customers.

RN: In the IPO prospectus, you should check … unless maybe the banks did the work for the diligence and then, you know, did not disclose it but those are things which, you know, that's our lack. You know, they ask you things like volume. You know, they should disclose volume, right?

…

and I'm surprised no one has asked. I'm just shocked that no one on the Street has asked for the volume numbers. That just boggles my mind.

PP: They do not disclose volume.

RN: I know that and that's one issue that I had with them. That's why I am not part of that thing at all and we had not a very good way to exit because there were very simple things which they should disclose, which they did not want to as IR I said, "If you can't disclose this, then I can't be involved," right?

PP: Right.

RN: But at the end of the day, I think those are the questions which … those are very simple questions people should be asking.

…. But at the end of the day, I think if you focus on the end clients – I think you should – and volume are two ways to look at the numbers. I mean, for example, if they are saying that their numbers volume is a million tons, while the overall in the market is only two million tons, then you know that's incorrect, right?

PP: Yes…

RN: Look, you should definitely get a handle as an analyst, whether the company, you know, on volume, right? What are volume sales? You should definitely get a handle on top 20 customers or top 30 customers in India also and, you know, top 20 providers of rice paddy, raw materials, right? Are they independent? How big are they? How small are they? You know, these are very important things for disclosure and I'm surprised people haven't asked for it.

Again… you should focus on the disclosure detail because that's where you'll find issues, not on the structure and holdings and companies. There's nothing there, trust me.

- Ex. 2, Report 2, pg. 7, emphasis added.

80.     Report 2 also includes a transcription of a conversation with a Former Amira Audit Committee member which was reported in a shorter excerpt in Report 1.  In that conversation, the interviewed Former Amira Audit Committee member confirms that, at the time of his service, Karam Enterprises, was Amira's sole distributor in the Middle East and some African nations.  The transcription states:

> PP: And I know you were on the audit committee -- were you aware, you know, are you aware of all these different related parties that exist? There are tons of companies, some of which operate in the same business as Amira that are or were stationed at Amira's own headquarters…
>
> Karam Industries is known to be owned by Chanana's father. Going into Amira's IPO in 2012, that entity appears to have injected funds into Amira [after a shipment of its Amira rice was seized by the Philippine government], receiving no effective value in exchange; Amira turned around and booked those funds as revenue, enabling it to tout growing sales. There's another one called Amira Enterprises. Amira Enterprises is [owned and] controlled by Karan Chanana. Official records show that it is the same business as ANFI and is based at Amira India's headquarters.
>
> What is your take is on this kind of information?
>
> Former Audit Committee Member: … the two issues that you're raising, which would certainly cause me pause, if you believe that the numbers are inflated and then if you believe that there's all of these inter-company … [I think] the concerns that you're raising… are certainly valid…
>
> PP: **Karam Enterprises**, **this company used to display on its website that it is Amira's sole distributor in the Middle East and some African nations. Is that still the case**?
>
> Former Audit Committee Member: **It was when I stepped off the board**.[6] Is it still the case today? I don't know.

-   Ex. 2, Report 2, pg. 8, emphasis added.

---

[6] PPRG states that this former board member left the Company in September 2013.

81.   In addition, both Reports contain PPRG's conversation with KRBL's CFO.   In Report 1, the KRBL CFO is identified generically as a KRBL key executive.   After KRBL's Chairman sent a letter to Amira stating that he was "confident there was no involvement from KRBL" in PPRG's report, PPRG felt it prudent in Report 2 to identify more specifically the KRBL executive to whom they spoke.   There has been no announced rebuttal from KRBL following Report 2.

82.   The interview with KRBL's CFO in Report 1 states:

PP: When you are out in the field – conducting business, and competing – do you feel Amira's presence, and to what degree? How strong is Amira's brand, you think, in the Indian market?

KRBL: Their market share is much less than five percent here. We don't perceive them as a threat at all.

PP: Less than 5%? Amira reports having generated $224m of branded sales in India in FY'14. We estimate $170m of that was from branded Basmati. (Note: KRBL in FY'14 generated approximately $230m from and has a 30% market share in branded Basmati in India)

KRBL: That is where we are surprised. Where are they selling? At $220m – that is 1,500 crores – **Amira is reporting almost the same level of sales as KRBL, maybe a little more. But where are they selling? We have a 30% market share and they have less than 5% market share. Where are they selling?** That's where we are concerned.

…..

They maybe trading into non-basmati business. They may be doing some trading business, they're buying and selling and doing without much profit. **They're not into the branded segment that much. Their presence is not that much. Their market share is not there in the basmati so maybe they're doing some trading in non-basmati just to gain numbers**.

PP: No, well, they tell investors Amira is primarily a basmati business. Specifically, they say that Basmati was 65% of revenue

in FY'2014. That includes domestic and international business. So on Amira's reported revenue of $550m, that equates to $357m of basmati sold.

KRBL: I have no comment because we don't find them so much.

- Ex. 1, Report 1, pg. 11, emphasis added.

83.    The interview is repeated in Report 2 (Ex. 2, pg. 12).

84.    These conversations, quoted at length and with identified insiders, support the allegations regarding Amira's overstatement of Basmati export revenue, and overstatement of India revenue.  With particularity, they present a picture of a Company that is engaging in fake and/or circular sales with related parties, manipulating the routing of funds, and exaggerating the Company's market share and branded sales.

85.    In addition, Plaintiff's counsel's investigation included conversations with several individuals including an outside consultant for more than eight years for Amira Foods India Ltd.'s New Delhi office who confirmed that Amira had overvalued the Company's exports; a General Manager for Choithram's - a large distributor in Dubai who formerly worked with Amira and was unable to sell a significant quantity of Amira rice because there was insufficient demand for their products and even today does not see many Amira products on the shelves; APEDA employees; a banker that provides loans to Amira; and individuals at the Food and Drug Administration: Center for Food Safety – Food and Cosmetics Information Center, the United States Department of Agriculture, and the U.S. Customs and

Border Protection. Although some former employees, insiders, and others were worried about supplying information, an Amira Regional Sales Manager in the Middle East and Africa through May 2013 reported that, to bolster the Company's reputation as a publicly traded company on the New York Stock Exchange, Amira took overdraft money from the Company's India office and moved it to the Dubai office, in order to enable the Company to show a financially strong image in Dubai and with that financially strong Dubai presence, borrow money from a United Arab Emirates local bank.  The money was then reportedly transferred to the United Kingdom office which in turn transferred funds to the United States office.  At the very least then, this corroborates information gleaned from PPRG's interview with CFO1 concerning the routing of funds.  Moreover, Amira states on the Company website and in SEC filings (including the 2013 20-F and an investor presentation filed with the SEC in 2015) that Amira sold its third-party branded products to many large international and regional customers, including SGS International Rice Co. Inc. ("SGS") but upon contacting SGS, Plaintiff's counsel was told that their relationship with Amira ended ten years ago.

### D.   Amira's Overstatement of Basmati Export Revenue

86.   According to APEDA, Amira exported approximately $69 million and approximately $87 million of Basmati in FY'13 and '14.   In the table below, PPRG compares this data to Basmati export sales claimed by Amira in its SEC financials:

**Amira Overstatement of Revenue from Basmati Exports**

| ($ millions) | FY 13 | FY 14 |
|---|---|---|
| Reported Export Sales | $ 224.8 | $ 323.2 |
| (-) Reported Institutional Sales | $ 7.4 | $ 69.4 |
| Export Rice Sales (1) | $ 217.4 | $ 253.8 |
| (+) India Rice Sales (1) | $ 188.9 | $ 224.1 |
| Total Rice Sales (1) | $ 406.3 | $ 477.9 |
| *Export Rice Sales, % of Total Rice Sales (1)* | *53.5%* | *53.1%* |
| (*) Reported Total Basmati Sales | $314.8 | $356.8 |
| **Revenue from Basmati Exports Claimed in Amira's SEC Financials (1)** | **$168.4** | **$189.5** |
| **Official Data for Amira Revenue from Export Sales, per APEDA** | **$68.6** | **$87.4** |
| **Overstatement of Revenue from Basmati Exports (1)** | **$99.9** | **$102.1** |
| *% Overstatement of Revenue from Basmati Exports (1)* | *145.6%* | *116.9%* |

(1) Prescience Point estimates
Sources: ANFI filings with the SEC, conversations with ANFI management, APEDA data

Note: ANFI does not disclose its Basmati Export Sales; however, it does provide enough information to derive a close estimate. While the logic involved in estimating this metric (as described below) is straight-forward, we corroborated the validity of our methodology with current ANFI CFO Bruce Wacha:

> **PP:** International vs India sales were split almost 60%/40% [in FY'14]; I'm wondering whether it's safe to simply split total basmati sales using that same ratio in order to estimate international basmati revenue

> **Bruce Wacha:** *The institutional business is non-India; if you back that out, it's safe to make that assumption…*

**Method and Assumptions:**
- we assume all Institutional revenue is classified as export revenue (i.e., all India revenue is generated from the sale of rice), a safe assumption given that most institutional sales have been made to a single customer in Bangladesh
  - by backing out institutional sales from reported export revenue, we derive an estimate of international rice sales.
- we then calculate the proportion of total rice sales made in India vs Internationally
- we assume the proportion of basmati revenue to total rice revenue is equal regardless of whether the sale is domestic or international, & calculate basmati export revenue in accordance with the % of estimated total rice sales generated from exports

87.    In this base case analysis, outlined in the table above, PPRG estimates that Amira overstated its Basmati export sales by approximately 145% in FY'13 and approximately 117% in FY'14 and Amira overstated its Basmati exports by approximately $100 million in FY'13 and approximately $102 million in FY'14 -

meaning that approximately 24% and approximately 18.7% of ANFI total sales in FY'13 and FY'14, respectively, were fabricated.

88.    As discussed above, only certain limited information concerning the various types of revenue is provided by the Company in their SEC filings.   The Company discloses total Basmati rice revenue as a percentage of total revenue (e.g. 76.1% of total 2013 revenue which is equal to $314.8 million) but it does not disclose how much revenue it derives from Basmati rice **exports**.   However, according to Defendant Wacha's comment in the earnings conference call,[7] there is a general split of roughly 60% of the total revenue as international with the other 40% coming from India.[8]

89.    According to the information in PPRG Report 1, when asked by PPRG if this 60/40 (international/India) split can be applied to Basmati rice sales, Defendant Wacha replied "The institutional business is non-India; if you back that out, it is safe to make that assumption…"  (¶86 above and Ex. 1, pg.8).

---

[7] In the August 28, 2014 Q1 2015 Amira Nature Foods Ltd Earnings Call, Defendant Wacha states, "As you can see from the second page of our presentation, Amira branded and third party branded sales represented 99% of total sales for the quarter. This is up from 96% in the year ago quarter. This is largely due to our growth in core Rice and a smaller contribution on the institutional or agricultural product side. As you can see on the right side of the page, we have maintained the traditional 60/40 split between our international sales and our sales made within India." Filed as Exhibit 99.3 to a Form 6-K, and accessible through SEC's EDGAR website at http://www.sec.gov/Archives/edgar/data/1552448/000114420414053204/v387999_ex99-3.htm.

[8] *See also* "For the fiscal year ended March 31, 2014, we derived 40.9% of our revenue from sales in India..." 2014 20-F, p.25.

90.    Therefore, based on the Company's filings which reported that Basmati revenue is 76.1%[9] of total revenue, we can calculate that 60% of this is revenue from exported Basmati rice.  The 2013 20-F reports total revenue for FY'13 as $413.7[10] million.  After "backing out" the institutional sales ($7.4 million), this becomes $406.3 million.  76.1% of $406.3 million indicates that Amira revenue from Basmati rice in FY'13 was $309.19 million. Sixty percent of $309.19 million is $185.52 million and therefore Amira's SEC filings reported $185.52 million in revenue from Basmati rice exports in 2013.  This is considerably more revenue than the $68.6 million in Amira Basmati rice exports that the APEDA reported for FY'13. International revenue was therefore overstated by at least $116.92 million in FY'13.

91.    Similarly, Amira reports in its 2014 20-F that 65.2%[11] of the Company's total revenue was derived from Basmati rice sales.  The 2014 20-F reports total revenue for FY'14 as $547.3 million.[12]  After "backing out" the institutional sales ($69.4 million[13]), this becomes $477.9 million.  Revenue from Basmati rice sales is reported to be 65.2% of the $477.9 million, or $311.6 million. Sixty percent of $311.6 million is $187 million and therefore Amira's SEC filings reported $187 million in revenue from Basmati rice exports in 2014.   This is

---

[9] 2013 20-F, pg. 42.
[10] 2013 20-F, pg. 6.
[11] 2014 20-F, pg. 42.
[12] 2014 20-F, pg. 5.
[13] 2014 20-F, p. 41

considerably more revenue than the $87.4 million in Amira Basmati rice exports that the APEDA reported for FY'14. International revenue was therefore overstated by at least $100 million in FY'14.

92.    The Plaintiff's counsel calculations for FY'13 and FY'14 are summarized in the following chart:

| | FY'13 | FY'14 |
|---|---|---|
| | ($ in millions) | |
| Total Revenue (Reported by Amira) | $413.70 | $547.30 |
| Less Institutional Sales (Reported by Amira) | ($7.40) | ($69.40) |
| | $406.30 | $477.90 |
| % of Revenue from Basmati (Reported by Amira) | 76.10% | 65.20% |
| Revenue from Basmati Rice | $309.19 | $311.59 |
| % of Revenue from International Sales | 60% | 60% |
| 60% of Basmati Rice Revenue | $185.52 | $186.95 |
| Amira Basmati rice exports according to APEDA | $68.60 | $87.40 |
| overstatement of revenue from exported Basmati rice | $116.92 | $99.55 |

93.    Had Amira truly generated the revenue from Basmati exports it reported to US investors, it would have been the 4th and 5th largest exporter of basmati rice in FY'13 and FY'14, respectively, and earned the corresponding slots in the APEDA tables above.

94.    By comparison, competitor Indian Basmati exporters report Basmati export sales comparable to the export data compiled by APEDA.

95.    KRBL and LT Foods are the dominant players in Amira's industry. They have the #1 and #2 market shares, respectively, for the sale of branded Basmati in India.  KRBL also has the #1 export share for Branded Basmati. Their export

numbers line up with APEDA's as indicated in the following table provided in the

Report:

| Comparison of APEDA reported sales with company reported export sales figures- FY14 | |
|---|---|
| **$ Million** | |
| **KRBL** | |
| Total reported export rice sales | 187.3 |
| Total export Basmati rice sales (1) | 179.8 |
| APEDA reported export revenue | 174.2 |
| **Difference** | **5.6** |
| | |
| **LT Foods (2)** | |
| Total reported sales | 398.5 |
| Total Basmati rice sales (2) | 278.9 |
| Total export Basmati rice sales (3) | 121.7 |
| APEDA reported export revenue | 123.6 |
| **Difference** | **(1.8)** |
| | |
| **ANFI** | |
| Total Basmati rice sales claimed | 189.5 |
| APEDA reported export revenue | 87.4 |
| **Difference** | **102.1** |

(1) According to KRBL filings, Basmati rice contributed to 96% of the domestic rice sales. We are assigning the same percentage for export sales.
(2) According to LT Foods' filings, Basmati rice contributed to 70% of its total sales.
(3) LT Foods' export sales to total sales ratio for FY was 44%. We apply the same percentage to derive Basmati export sales for the company

96.    A complete list of Basmati Rice exporters in India, available from the

APEDA    at    http://itrack.apeda.gov.in/onlineregistration/Directory_ExpList.aspx,

does not include any discernible Amira related parties whose Basmati rice export

revenue might reasonably be included in Amira's finances to account for the large

discrepancy. Moreover, even if there are Amira related entities whose exported

Basmati rice revenue is being included in Amira's SEC financial reports, these

related parties have not been disclosed as required.

97.     It is immaterial that Amira outsources the processing of some the rice to third-parties.  Nayar addressed this (inappropriate) explanation in his interview with PPRG and stated in part:

> … you know the company only manufactures a part of its rice, right? [The remainder] is outsourced, so did they have [the outsourced 3rd party] ship it to the client in [the 3rd party's] name? If they did that, then [Amira] can't count it as international sales, can they, right?
>
> So I mean, you know, that would be an answer 'somebody' would give, "Oh, but I outsourced it."
>
> "Yes, but if you outsourced it, then it's not international sales to you; it is instead sales for that manufacturer or outsourcer." Right? So I think that's a very valid question and there were some things I struggled with before when I was there. But I don't think the US market cares, as long as the revenue numbers are what they are.
>
> -   PPRG Report 2, page 20

98.     Both International Financial Reporting Standards ("IFRS") guidance and APEDA regulations require the recognition of revenue on export sales in the name of the entity exporting the goods.  Hence, in the situation where a third-party is shipping products in its own name, the revenue should be recorded by the third-party, not Amira.

99.     As discussed above, APEDA allots the RCAC and records the export in the name of outsourcer exporting the Basmati.

100.   Under the IFRS, allotment is granted by APEDA based on the export contract, which represents the transfer of the title to goods.  International Accounting Standard ("IAS") 18 mandates the transfer of significant risks and rewards

associated with the ownership of goods as one of the criteria for revenue recognition.[14]

101.   When exports are made by third party in its name, the export contract will be in third party's name, consequently the transfer of ownership (and risks and rewards) is also made by the third party.  Hence, it is conclusive that the sale is made by the third party.

102.   Amira recording these sales made by third parties would not only amount to violation of IAS 18, but also revenue fabrication.

**E.   Amira's Overstatement of Revenue from Sales in India**

103.   According the Company's 2014 20-F, Amira faces competition from "both Indian and international producers of Basmati and other rice and other food products."

104.   In choosing a set of comparables for Amira, PPRG selected 3 publicly traded Indian Basmati rice companies – KRBL, LT Overseas, and Kohinoor Foods.  These are the top three branded Basmati companies.  Compared to Amira, each of these companies has a larger processing capacity, greater brand recognition (both in India and international markets), and significantly greater financial and operational resources.

---

[14] As per the revenue recognition principle set forth in IAS 18, an entity can recognize sales only when it:
- 'transfers significant risks and rewards of ownership of the goods'
- 'retains neither continuing managerial involvement to the degree usually associated with ownership nor effective control over the goods'




105.   As demonstrated in the above charts, the results of the comparison are astonishing.  Amira is reportedly generating the most revenue on the least processing capacity of any of its peers.  Amira's sales exceed KRBL's, yet Amira has little more than a tenth of KRBL's processing capacity. Of all comps, KRBL has the most processing capacity, and it is widely known as the largest branded Basmati company in India.

106.   In addition, Amira reports the highest gross margin in the peer group. Amira's gross margin is higher than KRBL's.  Higher margins should indicate better pricing power, greater operating efficiency, and a higher proportion of Basmati and branded sales verses total sales.  But Amira possesses none of these advantages.

107.   Based on KRBL information, PPRG's Report 1 provides an analysis of Amira's India revenue.  Report 1 explains in part:

- KRBL has a 30% market share in the branded Basmati space in India. KRBL's FY14 revenue from Basmati rice sales in India was approximately $230m. Using these data points we back into a total branded Basmati market size of $ 766.7m for India.

- For [Amira], we assume a market share of 5% share, per KRBL. This implies [Amira], at this market share, would generate India revenue of $38m, which is $185m less than what [Amira] reports.

- By summing [Amira]'s suspect export sales ($102.1m) and suspect India sales ($185.8m) we get a total for [Amira] suspect sales of $287.9m, which is 52.6% of its FY14 reported sales, indicating potential revenue overstatement of >100%.

108.   Based on this analysis, therefore, Amira has overstated the Company's revenue from Basmati rice sales in India in FY'14 by $185 million.

109.   The following PPRG chart summarizes their analysis of Amira's revenue overstatement, indicating 52.6% of Amira's sales in FY'14 are non-existent:

| Prescience Point Estimate of Indentifiable ANFI Suspect Sales - FY14 | | |
|---|---|---|
| Description | Calculation | Value |
| (USDm) | | |
| Suspect sales from Basmati rice exports | | |
| Revenue from Basmati exports claimed in ANFI's SEC financials (1) | | 189.5 |
| Basmati rice sales- as per APEDA | | 87.4 |
| Suspect export sales | | 102.1 |
| Suspect sales as a percentage of total reported sales for FY14 | | 18.7% |
| Suspect sales from India | | |
| Total India sales- Reported (2) | | 224.1 |
| Actual India sales calculation | | |
| India Basmati Market size estimation based on KRBL financials (3) | 230/ 30% | 766.7 |
| ANFI's Basmati rice market share for India (4) | | 5% |
| ANFI Basmati sales for India | 766.7* 5% | 38.33 |
| Suspect sales from India | | 185.8 |
| Suspect sales as a percentage of total reported sales for FY14 | | 33.9% |
| Sales overstatement | 102.1+185.8 | 287.9 |
| Total suspect sales as a percentage of total reported sales | | 52.6% |

(1) We have provided a detailed calculation of this figure in one of our earlier exhibits

(2) PP estimates all of ANFI's India sales are Basmati sales

(3) Conversations with KRBL management revealed that KRBL has a market share of 30% in the Indian Basmati rice market. KRBL's FY14 revenue from Basmati rice sales in India was approximately $230m. Hence we divide KRBL's revenue by market share to arrive at the total market size

(4) KRBL management also indicated that ANFI's market share is less than 5%. We assume a conservative share of 5% for ANFI

## F.       Related Party Transactions

110.    Statement of Financial Accounting Standards ("SFAS") No. 57 and No. 850 provide that a public company's "[f]inancial statements shall include disclosures of material related party transactions." SFAS No. 57 ¶ 2; 850-10-50-1.   "Related party transactions" include those between "an enterprise and its principal owners, management, or members of their immediate families" and those between a company and its "affiliates." SFAS No. 57 ¶ 1; 850-10-05-3. "Affiliate" includes any company that is under common control or management with the public company. SFAS No. 57 ¶ 24(a, b); 850-10-20.

### 1.       Karam Enterprises

111.    After close of market on April 2, 2013 an article entitled "Amira Nature Foods – Underfunded and Overvalued" was published on seekingalpha.com. The article details how Amira is not adequately funded and involved with many related party transactions. The article discusses Amira's sole representative of Amira Foods in the Middle East, Karam Enterprises, which is operated by Defendant Chanana's father, Anil Chanana. The article states in relevant part:

> One particularly troubling related party relationship worth detailing is with a company called Karam Enterprises. Karam Enterprises, according to their website, is the sole representative of Amira Foods for the Middle East (Amira's largest market outside of India) and some African countries. The contact phone number for Karam is 9714-2351755 which is the same number Amira uses for their Dubai headquarters. The whois data for Karam's website also shows that Amira Foods is the registrant. Additionally, the managing director of Karam is Anil Chanana, who is the father of Karan Chanana, the current CEO of ANFI.

According to the 2006 annual report, Anil had previously been the managing director of Amira prior to his son taking over, before resigning from Amira for personal reasons. Amira had been a 5% owner of Karam, with Anil owning 34%, and Karan owning 24%, but Amira appears to have sold their 5% Karam ownership stake in fiscal 2007. Additionally, as of 9/27/2012, Karam Industries, with Anil signing as representative, owned 1,113,134 shares of Amira India. This is a disturbing conflict of interest, and a nightmare for maintaining proper internal controls.

112.   PPRG confirms that Amira has been transacting with an undisclosed related party Karam Enterprises since the IPO, and that Karam Enterprises was Amira's largest customer. Karam was purportedly Amira's sole distributor in the EMEA, its largest market outside of India.

113.   Report 1 discloses a conversation PPRG had with a former Amira director who served on the audit and corporate governance committees. The former director stated that:

1. Karam was indeed Amira's largest customer (as it once claimed on its website), and

2. Amira was still transacting with Karam through the date of his resignation at the end of Q3'2013.

114.   Amira's relationship with Karam is significant in part because of the robust revenue which Amira reports from the UAE.

115.   Amira reported UAE revenue of approximately $114 million in FY'14.[15]   According to APEDA, India exported a total of approximately $197 million of Basmati rice to UAE in 2014.

_____
[15]2014 20-F, pg. F-43.

116.   If Amira sells only Basmati into this market, these metrics suggest that Amira is monopolizing the UAE Basmati market, with a 58% market share. This cannot be the case in light of disclosures by KRBL and Tilda, two of the largest and most reputable branded Basmati players.

117.   According to KRBL's 2014 annual report, "KRBL is the largest branded basmati player in Saudi Arabia, UAE, Kuwait, Bahrain, Qatar, Oman & Lebanon."

118.   According to Tilda marketing documentation, "In the UAE alone Tilda has the highest value market share (Basmati) in the organized retail segment (Supermarkets)."

119.   Even if we assume Amira also sells non-Basmati to UAE, the revenue the Company claims in this market is not accurane. According to APEDA, India exported a total of $116.5 million of non-Basmati rice to UAE in 2014.  In sum, India exported a total of $313.6 million of Basmati and non-Basmati rice to UAE. Amira's reported UAE revenue implies a 36% share of the total market for rice in UAE.

120.   This over-reporting echoes the concerns expressed in interviews with Nayar and the Former Amira Audit Committee member that Karam and other undisclosed related parties were fabricating revenue for Amira with fake or circular transactions. *See infra* Section IV. C.

### 2. Other Undisclosed Related Parties are Clients and Suppliers

121.  The Reports raise additional important questions regarding Amira's clients and suppliers.  According to PPRG, there are over a dozen undisclosed related party entities situated inside Amira headquarters, some of which are in the same business as Amira.

122.  Report 1 (pg. 22) states in relevant part:

> Motivated by evidence that ANFI is not fully disclosing related party transactions, we became suspicious that additional related parties may exist.  Further investigation revealed scores of undisclosed related parties that either,
> 1. List ANFI's corporate or registered address as their own
> 2. List an @amirafoods.com email address for official contact
> 3. Are directed by Karan Chanana and/or his wife Radhika
>
> By our count, we identified 11 related parties that have never been mentioned in ANFI's SEC filings, on the company's website, or in any public forum. Most meet all of the above criteria –> they are operated from <u>within Amira's headquarters</u>, <u>use Amira email addresses</u>, and are <u>directed by Karan Chanana</u> <u>or his wife</u>.
> We have found that at least a couple of these entities <u>are in the business of distributing rice, including Basmati rice, and other commodities</u>. They are in the <u>same business as ANFI, and operating from the same address</u>.
> • These two entities are Bharat Food Traders and Amira Enterprises Ltd.

(emphasis in the original).

123.  These entities are summarized in the following charts also provided in Report 1:

| Business Name | Amira Sez and Infrastructure Pvt Ltd | Amira Renergy Private Ltd | Amira Enterprises Ltd | Amira Pure Foods Private Ltd | Amira Infraa Structure Private Ltd | Amira Info Technologies Private Ltd | Amira Investments Private Ltd |
|---|---|---|---|---|---|---|---|
| Address | 54 Prakriti Marg, Sultanpur Farms | 54 Prakriti Marg, Sultanpur Farms | 54 Prakriti Marg, Sultanpur Farms | B-1-E-28, Mohan Cooperative Industrial Estate, ND Mathura Road | 54 Prakriti Marg, Sultanpur Farms | 37, Bandh Road, M.g. Roadnew Delhi, , Delhi, India | 54 Prakriti Marg, Sultanpur Farms |
| Contact | gurpreet.kaur@amirafoods.com | gurpreet.kaur@amirafoods.com | gurpreet.kaur@amirafoods.com | gurpreet.kaur@amirafoods.com | gurpreet.kaur@amirafoods.com | gurpreet.kaur@amirafoods.com | ishita.kapoor@pegasusbt.com |
| Directors | Karan Chanana Radhika Chanana | Karan Chanana Radhika Chanana Anita Daing | Karan Chanana Radhika Chanana (MD) Anita Daing | Karan Chanana Anil Gupta Anita Daing Shyam Poddar Rahul Sood | Karan Chanana Anita Daing | Karan Chanana Radhika Chanana | Anil Chanana Kunal Chanana Anita Daing |

| Business Name | Anantyaa Enterprise Private Ltd | Kenetic Exports Pvt Ltd | Sharbati Enterprises Private Ltd | Ad-E Biss.com Private Ltd | Cue Enterprises Private Ltd | Bharat Food Traders |
|---|---|---|---|---|---|---|
| Address | 54 Prakriti Marg, Sultanpur Farms | 4/80, Janpath, New Delhi, Delhi, India-110001 | B-1-E-28, Mohan Cooperative Industrial Estate, ND Mathura Road | 54 Prakriti Marg, Sultanpur Farms | 54 Prakriti Marg, Sultanpur Farms | 54 Prakriti Marg, Sultanpur Farms |
| Contact | rajesh.arora7777@gmail.com | gurpreet.kaur@amirafoods.com | gurpreet.kaur@amirafoods.com | gurpreet.kaur@amirafoods.com | gurpreet.kaur@amirafoods.com | |
| Directors | Karan Chanana Radhika Chanana | Karan Chanana(former director through 11/2011) Radhika Chanana Anil Chanana | Karan Chanana Radhika Chanana | Karan Chanana Radhika Chanana | Radhika Chanana Anish Chanana | |

124.   PPRG also identified a related party company named Gautam TechAgro India Pvt Ltd. ("Gautam") which claims to claims to be one of Amira's largest suppliers and has a senior-level employee claiming it to be Amira's national distributor.

125.   Neelkanth Suppliers ("Neelkanth") and Pheasent Commerce ("Pheasent") are two shell company owners of related entity Amira Enterprises.

126.   Ministry of Corporate Affairs ("MCA") filings for Neelkanth and Pheasent indicate that Chanana – through entities he owns and directs – appointed a

common director for Neelkanth and Pheasent – Gian Chand Sethi ("Sethi").  Sethi is the signatory on file with the Ministry of Corporate Affairs for these two entities.

127.   Sethi is also Chairman of Gautam which was founded on December 8, 2011 (a few months of Chanana's transfer of Amira Enterprises equity to Neelkanth and Pheasent).

128.   According to marketing documentation produced in April 2013, Gautam claims to be one of Amira's largest suppliers:

> **Our Valued Customer**: We are one of the major suppliers of Rice to India's major rice players like Amira Pure Foods, LT Food (Dawaat Brand), DD International & Amirchand Jagdish Kumar (Aeroplane Brand) and on International Level we have our pride name Al Maya Group of UAE, Al maya is one of the biggest buyer of our basmati rice.  Having around 550TMT volume to these customers annually.

129.   Moreover, according to the professional profile page on Yatedo.com (similar to LinkedIn) of Gautam's head trader, Balwant Sigh Rana, Gautam is also "National distributor for Amira Foods."

130.   Both the 2013 20-F and the 2014 20-F state that "Since the IPO, we have not entered into any purchase or sale transactions with any related party."  This is a materially false statement because Amira has continued to engage in related party transactions since the IPO.

131.   Therefore, these related party transactions – disclosed or undisclosed – were being conducted after the IPO.

### 3.    Amira's $30M Sham Real Estate Transaction

132.   Amira states that it intends to transfer $30 million of $225 million of what will be newly raised of debt.  PPRG reports that the proposed transfer amounts to a sham real estate transaction.

133.   Amira's Form 6-K filed on January 28, 2015 states that the Company's intent is to raise $225 million in debt capital.  In addition, $30 million of the $225 million raised will be applied toward purchasing Amira Enterprises Private Ltd.  Per MCA records, "Amira Enterprises Private Limited" is the former name for the entity Amira Enterprises Limited.  Amira states the reason for the purchase is to take ownership of an 86 acre plot of land Amira Enterprises holds.

134.   The Form 6-K filed on January 28, 2015 was materially false and misleading because it did not disclose the true ownership and operations of Amira Enterprises, the company that Amira was going to acquire to get its plot of land. According to Report 1, "most of the $30m will go directly to Karan Chanana who owns Amira Enterprises through shell companies he set up that are owned by companies he owns."

135.   Amira Enterprises is more than a holding company that owns a plot of land; it is in fact in the business of selling Basmati rice and other commodities. Amira's purchase of Amira Enterprises would more appropriately be described as the purchase of a related party which is also a customer and/or competitor of Amira Pure Foods.

136.   The purchase price appears to be multiples of both Chanana's purchase price and current market rates, amounting to an egregious transfer of shareholder capital into Chanana's pockets.

137.   Report 1 further details its research that:

1. Chanana purchased this 86 acre plot in 2009-2010 with the purpose of developing commercial real estate, but depressed real estate prices in the area have made this an economically unviable possibility. This land is personal real estate deal gone bust, that is being 'repurposed' for ANFI.

2. [Amira] is vastly overvaluing Chanana's property, for Chanana's pocketbook. At $30m, Chanana will reap a payoff (at shareholders' expense) of 5.3x his cost – for land that is no longer viable for its originally intended purchase

3. Based on our benchmarking of the 80 acre property against a basket of agricultural properties for sale in the same area, [Amira] is overvaluing the property by >2x. This is a conservative estimate.

4. [Amira] does NOT NEED THIS LAND.

138.   Chanana will earn a profit of approximately $24.3m, equating to a cumulative return of 445% for a plot presumably purchased in 2009-2010 – all on a real estate deal that has limited-to-no economically viable development prospects. He will also be made liquid on an asset potentially unmovable at his purchase cost.

139.   Amira already owns a 48.2 acre plot in Haryana, India on which it intends to build its new 48MT/hour processing facility. Arguably, this facility will

only require approximately 16 of those 48 acres.[16]  There is no need to transfer $30m of shareholder capital to the CEO for an additional 86 acres.

140.   In addition to the windfall from the sale of this property, Defendant Chanana's compensation for his position at Amira is as PPRG states "astoundingly more than 3x the average of his peers." The industry average is $275,491 while his annual salary is $946,200. He also lent money to Amira at 11.6% interest per annum compounded on a daily basis. According to Report 1, the "loan balances owed by the company as at FY12-14 amounted to USD 1.2mn on average."

141.   Not only is Defendant Chanana heavily compensated, but he also uses Amira funds for his personal expense.  According to Report 1, Amira is paying for a house manager and chef for Defendant Chanana's farm house.

142.   The related party transactions benefited the Company's CEO and his family at the expense of shareholders.

143.   The related party transactions therefore support a strong inference of scienter.

---

[16] Per the 2014 20-F, "As of March 31, 2014, we have secured 48.2 acres in nearby Haryana, India and have begun construction of our new processing plant…"

According to Amira's 20-F, the Company's existing facility, which processes 24 MT of paddy per hour, spans a covered area of 310,221 sq ft, or approximately 7.12 acres; the new facility, with 2x the processing capacity, should demand approximately 2x the acreage, or approximately 16 acres.

### G.   Materially Untrue Statements and Omissions in the Offering Documents

144.   The Registration Statement was signed by Defendants Chanana and Suneja.  On September 27, 2012, the Company filed its final Registration Statement amendment with the SEC on Form F-1/A.

145.   On October 11, 2012, in connection with the Company's IPO, Amira filed a Prospectus on Form 424B4 with the SEC.

146.   The Registration Statement and Prospectus are collectively referred to as the "Offering Documents."

147.   The Company amassed $90,000,000 in its IPO, selling 9,000,000 ordinary shares of Amira securities at $10 per share.

148.   The Offering Documents were materially false because they failed to adequately detail related party transactions.  The Offering Documents discussion of related party transactions summarizes these transactions as "loans and advances, issuances of securities, and purchases and sales of goods and raw materials" and rent paid to Defendant Chanana for offices in India but does not disclose: the involvement of Karam Enterprises; that multiple entities operating from the same address as Amira are in the same business as Amira and are functioning as undisclosed clients and suppliers of Amira; the incredible windfall that  Defendant Chanana is personally receiving for the (unnecessary) sale of his land to the Company; nor that the Company pays for a house manager and chef for Defendant Chanana's farm house.

149.   Moreover, the reported revenue in the Offering Documents is incorrect. Amira's fiscal year ends on March 31. The 2013 20-F, therefore, covers the time period from April 1, 2012 (pre IPO) through March 31, 2013.  As discussed above, Amira overstated the Company's Basmati rice sales revenue in the 2013 20-F and during this time period.

150.   The Offering Documents therefore contain incorrect revenue from exported Basmati rice, stating in part:

> We expect to continue to benefit from this significant growth in global demand for Basmati and other specialty rice, which we believe will outpace the growth of the overall rice industry.
>
> \* \* \*
>
> Revenue increased by $74.0 million, or 29.0%, to $329.0 million in fiscal 2012 from $255.0 million in fiscal 2011, primarily due to an increase in prices, and to a lesser extent an increase in volume. These higher prices are ***attributable to the higher proportion of our revenue derived from sales of Basmati rice, which commands higher prices than non-Basmati rice***. This revenue growth was driven primarily by sales of third party branded products to our international customers, which increased by $62.9 million, or 53.3%, in fiscal 2012, and by revenue from sales of Amira branded products, which increased by $26.7 million, or 28.0%, in fiscal 2012 as compared to fiscal 2011.
>
> \* \* \*
>
> Revenue from international sales increased by $59.3 million, or 37.6%, to $217.0 million in fiscal 2012 from $157.7 million in fiscal 2011, primarily due to a $62.9 million or 53.3% increase in revenue from sales of third party branded products ***to our international customers. This was primarily due to an increase in prices from a higher proportion of Basmati sales***.
>
> [Emphasis added.]

151.   In addition, the Offering Documents contain incorrect revenue from sales of Basmati rice in India, stating in part:

> In India, we primarily sell Basmati rice and other packaged foods such as ready-to-eat snacks under the Amira brand name. Branded Basmati rice typically produces higher margins compared to non-branded Basmati rice. Sales of our branded products have increased as a percentage of revenue in recent years, and we believe that the expansion of our distribution network and arrangements with large retail chains in India will result in increased Indian revenue from Amira branded products.
>
> * * *
>
> India revenue.   ***Our Indian sales accounted for $94.0 million, $97.3 million and $112.0 million of revenue for fiscal 2010, 2011 and 2012, respectively***. We currently sell Basmati rice in India through a network of distributors who distribute our branded products to traditional retail outlets. In order to increase our Indian revenue, we have recently entered into additional arrangements with leading retail chains for the distribution of our branded products. We had 62 Indian distributors as of March 31, 2012.
>
> * * *
>
> ***Revenue from sales in India increased by $14.7 million, or 15.1%,*** to $112.0 million in fiscal 2012 from $97.3 million in fiscal 2011, primarily due to our replacement of smaller distributors with larger distributors that were more successful at selling our products, enabling us to increase revenue growth.
>
> [Emphasis added.]

152.   These statements are materially false and misleading in that they are designed to portray Amira as being a global leader in the export of Basmati rice and a company which has experienced and will continue to experience an international strong and growing presence via the sale of Basmati rice – and that as a result of Amira's global leadership and strong and growing presence in the Basmati market,

the revenue from the sale of their Basmati rice would cause a) international revenue for the Company to rise higher than $217 million; b) Indian revenue for the Company to rise higher than $112 million; and c) total revenue from the Company to rise higher than $329 million.

153.   Moreover, these totals for international, Indian, and total revenue as stated in the Offering Documents were also materially false and misleading because, as indicated by the APEDA information and the PPRG analysis, even with the growth of fiscal years 2013-2014, Amira is not achieving these revenue totals and therefore could not have had these revenue totals at the time of the IPO.  With an overstatement of international revenue of at least $100-$117 million in 2013 and $100 million in 2014, total international revenue for those years ($107 million for FY'13 and $196 million for FY'14) is lower than that reported in the Offering Documents for FY'12 ($217 million) which would indicate negative growth if the $217 million in reported international revenue for the FY'12 is accurate.

### H.   Additional Materially False and Misleading Statements

154.   On June 13, 2013, Amira filed its annual report for the Company's fiscal year ending March 31, 2013, on Form 20-F.  The 2013 20-F was signed by Defendants Chanana and Poddar.

155.   As well as repeating the false statements from the Offering Documents concerning the Company's strengths and position in the international and Indian

Basmati rice markets, the 2013 20-F is false and misleading in the reporting of revenue for the FY'13, stating in part:

> Our results of operations, cash flows and financial condition are affected by a number of factors, including the following:
>
> Demand for Basmati rice
>
> *In fiscal 2013, 2012 and 2011, we derived 76.1%, 69.8% and 61.0% of our revenue, respectively, from sales of Basmati rice.* Its unique taste, aroma, shape and texture have historically elicited premium pricing. Consumption of Basmati rice in India is estimated to have grown at a CAGR of 25.0% to 1.5 million metric tons in fiscal 2011 from less than 0.5 million metric tons in fiscal 2006, according to CRISIL Research. Indian Basmati rice exports grew at a CAGR of 20.2% by volume between fiscal 2007 and 2011. However, any negative change in customer preferences for Basmati rice may result in reduced demand and could harm our business and results of operations.
>
> Demand for our products in our international markets
>
> *In fiscal 2013, 2012 and 2011, our revenue from international sales was $224.8 million, $217.0 million and $157.7 million, respectively*, and accounted for 54.3%, 66.0% and 61.9% respectively, of our revenue in these periods. We sold our products to customers in over 40 countries and significant portions of our international sales were to Asia Pacific, EMEA and North America.
>
> * * *
>
> Revenue
>
> We derive our revenue primarily from the sale of Amira branded and third party branded products and bulk commodities to our customers in both Indian and international markets. The revenue is presented net of product returns, if any, made by customers.
>
> *Our revenue grew by $84.7 million or 25.7% in fiscal 2013 as compared to fiscal 2012, and by $74.0 million or 29.0% in fiscal 2012 as compared to fiscal 2011, respectively*. Revenue from both our Amira branded products and our third party branded products contributed an aggregate of 98.2%, 91.9% and 83.5% to our revenue in fiscal 2013, 2012 and 2011, respectively. Sales of bulk

commodity products to our institutional customers contributed 1.8%, 8.1% and 16.5% to our revenue in fiscal 2013, 2012 and 2011 respectively. We expect to continue benefiting from the significant growth in demand for Basmati and other specialty rice, which we believe will outpace the growth of the overall global rice industry and resulting margins. Our top five customers and distributors in fiscal 2013, 2012 and 2011 accounted for 33.4%, 46.6% and 50.5%, respectively, in these periods.

International revenue. ***Our international sales accounted for $224.8 million, $217.0 million and $157.7 million of our total revenue for fiscal 2013, 2012 and 2011, respectively***. Almost all of our international revenue is from sales to large distributors and global retailers. Our international revenue in fiscal 2013 was primarily derived from sales to customers in EMEA ($193.3 million), Asia Pacific ($24.7 million), and North America ($6.8 million). We had 23 international distributors as of March 31, 2013.

India revenue. ***Our sales in India accounted $188.9 million, $112.0 million and $97.3 million of revenue for fiscal 2013, 2012 and 2011, respectively***. We currently sell Basmati rice in India through a network of distributors who distribute our branded products to traditional retail outlets. In order to increase our Indian revenue, we have recently entered into additional arrangements with leading retail chains for the distribution of our branded products. We had 119 Indian distributors as of March 31, 2013.

[Emphasis added.]

156.   The 2013 20-F was therefore materially false and misleading because the revenues included in the financial statements were overstated and inaccurate. For example, the 2013 20-F incorrectly stated that Amira generated $224.8 million in revenue from exported goods.

157.   Additionally, the 2013 20-F was materially false and misleading because it failed to properly disclose related party transactions.

158.   On July 28, 2014, Amira filed its annual report for the Company's fiscal year ending March 31, 2014, on Form 20-F filed with the SEC.  The 2014 20-F was signed by Defendants Chanana and Wacha.

159.   As well as repeating the materially false and misleading statements from the Offering Documents concerning the Company's strengths and position in the international and Indian Basmati rice markets, the 2014 20-F is further false and misleading in the reporting of revenue for the FY'14, stating in part:

> Our results of operations, cash flows and financial condition are affected by a number of factors, including the following:
>
> Demand for Basmati rice
>
> ***In fiscal 2014, 2013 and 2012, we derived 65.2%, 76.1% and 69.8% of our revenue, respectively, from sales of Basmati rice.*** Its unique taste, aroma, shape and texture have historically elicited premium pricing. Consumption of Basmati rice in India is estimated to have grown at a CAGR of 15.0% to 1.5 million metric tons in fiscal 2013 from less than 0.5 million metric tons in fiscal 2006, according to CRISIL research. Indian Basmati rice exports grew at a CAGR of 24.0% by volume between fiscal 2008 and 2013. While we expect growth to remain strong, any negative change in customer preferences for Basmati rice may result in reduced demand and could harm our business and results of operations.
>
> Demand for our products in our international markets
>
> ***In fiscal 2014, 2013 and 2012, our revenue from international sales was $323.2 million, $224.8 million and $217.0 million, respectively***, and accounted for 59.1%, 54.3% and 66.0% respectively, of our revenue in these periods. We sold our products to customers in over 60 countries and significant portions of our international sales were to Asia Pacific, EMEA and North America.
>
> * * *

Our results of operations for fiscal 2014 and 2013, respectively, were as follows:

Revenue

***Revenue for fiscal 2014 was $547.3 million, an increase of $133.7 million or 32.3% compared to $413.7 million in fiscal 2013***. The revenue increase was primarily due to increased sales volumes and pricing for our Amira branded and third party branded products both in India and internationally, as well as a significant increase in our institutional sales. Revenue also benefited from the inclusion of revenue of Basmati Rice GmbH for the quarter ended March 31, 2014, which was acquired in January 2014. Basmati Rice GmbH had approximately $9 million in sales for the fiscal year ended December 31, 2013.

Revenue for our Amira branded and third party branded products was $477.9 million in fiscal 2014, up approximately $71.8 million compared to $406.2 million for the same period in fiscal 2013. Amira branded sales increased by $47 million, or 24.5% to $238.8 million, and third party branded sales increased by $24.7 million, or 11.5% to $239.1 million. Sales to the Company's institutional customers were also up significantly, contributing $69.4 million in revenue during fiscal 2014.

***Revenue in India was $224.1 million in fiscal 2014, an increase $35.2 million or 18.6% compared to $188.9 million in fiscal 2013***. Revenue in India benefited from an increase of larger distributors and the launch of company managed distribution centers, which were more successful at selling our products, enabling us to increase volumes, while also increasing pricing to offset input costs. Revenue growth in India was negatively impacted by the depreciation of the Indian rupee against the U.S. dollar in fiscal 2014. Our sales in India grew by approximately 31.5%, when measured in Indian rupees.

***Revenue from international sales increased by $98.4 million, or 43.8%, to $323.2 million in fiscal 2014 from $224.8 million in fiscal 2013***, primarily due to sales of Amira branded products and our institutional business.

The improvement in our revenue from sales of both Amira branded and third party branded products is a result of our current strategy of expanding our brand penetration in existing markets and ***accessing new international markets***.

[Emphasis added.]

160.   The 2014 20-F was therefore materially false and misleading because the revenues and financial statements included were overstated and inaccurate.  For example, the 2014 20-F incorrectly stated that Amira generated $323.2 million in revenue of export sales.

161.   Additionally, the 2014 20-F was materially false and misleading because it failed to adequately disclose related party transactions.

162.   On August 28, 2014, Amira announced financial results for its fiscal 2015 first quarter which ended on June 30, 2014 and filed the results with the SEC on a Form 6-K, stating in part:

> Revenue for the first quarter of fiscal 2015 increased 25.9% to $138.8 million, compared to $110.3 million for same period in fiscal 2014. The revenue increase was primarily due to continuing increases in sales volume, pricing and mix. Amira branded and third party branded sales increased by 29.3% to $136.8 million. Revenue from institutional sales fell marginally in dollar terms to $2.0 million from $4.4 million a year ago. Sales in India increased by 20.9% to $55.8 million (an increase of 30.3% in Indian rupees), while non-India or international sales increased by 29.5% to $83.0 million.

163.   On November 24, 2014, Amira announced financial results for its fiscal 2015 second quarter which ended on September 30, 2014 and filed the results with the SEC on a Form 6-K, reporting in part:

> Karan A. Chanana, Amira's Chairman and Chief Executive Officer, stated, "Our strong second quarter performance reflects increased demand and a favorable pricing environment for our products, with strong gains in our core Indian and Middle East

markets, while we continue to make progress in our expansion efforts throughout developed markets such as the US, UK and Continental Europe. During the quarter, we leveraged many of our existing relationships with international retailers, resulting in increased shelf space and volume around the world and across multiple sales channels. Additionally, we were successful in expanding our distribution through new partnerships, such as Snapdeal, India's largest online marketplace and Asda, a wholly owned division of Walmart. Importantly, we expect strong growth for the remainder of fiscal 2015, driven by ongoing distribution gains and market expansion, as we continue to successfully execute on our strategic initiatives."

Bruce Wacha, Amira's Chief Financial Officer added, "Today we reported our ninth consecutive quarter of double digit revenue and profit growth as a public company. Revenue, adjusted EBITDA and adjusted earnings per share were all up in excess of 30% for the quarter driven by strong pricing and double digit volume gains in our core Amira and third party branded business. ***Our Basmati and other specialty rice sales were up significantly,*** while our more opportunistic institutional business, as expected, declined from last year's exceptionally high levels. We continue to see many opportunities in our home market and around the world to grow our business and create value for our shareholders."

Second Quarter Fiscal 2015 Results

***Revenue for the second quarter of fiscal 2015 increased 30.9% to $141.4 million, compared to $108.0 million for same period in fiscal 2014.*** The revenue increase was primarily due to increases in sales volume, pricing and mix in Amira branded and third party branded sales. Amira branded and third party branded sales increased by $63.4 million or 82.0% to $140.7 million. Revenue from institutional sales fell to $0.7 million from $30.7 million a year ago. Sales in India increased by 41.2% to $55.3 million, or up 37.7% in Indian rupees, while sales outside of India or international sales increased by 25.1% to $86.1 million.

[Emphasis added.]

164.   These statements were materially false and misleading because they reported inaccurate revenue and financials, discussed Basmati and branded sales without disclosing the truth regarding the revenue from these sources, and did not disclose the fake and/or circular transactions with related parties that were artificially increasing Amira's sales numbers.

165.   On January 28, 2015, Amira filed a Form 6-K with the SEC discussing the acquisition of Amira Enterprises Private Limited ("Amira Enterprises").   The Form 6-K states in relevant part:

> [Amira] will apply $30.0 million of the net proceeds of the Notes as cash consideration to acquire Amira Enterprises Private Limited (the "Amira Enterprises Share Purchase"), an Indian company ("Amira Enterprises"), an entity which owns approximately 86 acres of land in Karnal, India adjacent to 48.2 acres of land that we have previously purchased and on which we have begun to construct our new processing and milling facility, including facilities for drying and storing rice paddy and Basmati rice and for storing and distributing Basmati rice and other products. Members of the family of our Chairman, Karan A. Chanana, currently own Amira Enterprises and will receive the proceeds of the sale to Amira Mauritius.

166.   As a result of these material misstatements and omissions, Amira's securities were offered at an artificially inflated price.

## I.   The Truth Begins to Emerge

167.   On February 9, 2015, PPRG issued their Report 1 exposing the material overstatements of revenues and undisclosed related party transactions by Amira detailed above.

168.   On February 9, 2015, Amira stock closed at $9.95 per share, falling $3.45 per share or almost 26% from February 6, 2015 when the stock closed at $13.40 per share.

169.   This stock drop damaged investors.

170.   On February 10, 2015, Amira issued a statement in which the Company announced it "categorically rejects and denies the many mischaracterizations and factually inaccurate statements put forth in the report that do not reflect reality." This statement was false and misleading in that Amira addressed Report 1 but did not confirm that there were many true allegations in the report – allegations that were material to investors.

171.   Several analysts cut their ratings for Amira following the PPRG revelations. On February 19, 2015, Moody's Investors Service withdrew the provisional (P)B3 rating on the USD225 million senior secured second lien notes due 2020. These were to be issued jointly by Amira Mauritius, and Amira I Grand Foods Inc. (BVI), both wholly owned subsidiaries of Amira. Concurrently, Moody's placed on review for downgrade the B2 corporate family rating (CFR) and B2-PD probability of default rating (PDR) of Amira.

172.   Amira's securities continued to be offered at artificially inflated prices.

173.   On March 2, 2015, Amira reported financial results for its fiscal 2015 third quarter which ended on December 31, 2014, and stated in part:

**Third Quarter 2015 Financial Highlights versus Third Quarter 2014:**

• Revenue grew 35.0% to $192.4 million compared to $142.5 million

• Adjusted EBITDA increased 36.6% to $27.7 million compared to $20.3 million

• Adjusted EBITDA margin of 14.4%

• Profits after tax increased 82.8% to $14.1 million compared to $7.7 million

• Adjusted profits after tax increased 52.9% to $15.9 million compared to $10.4 million

• Adjusted earnings per share ("EPS") was $0.44 compared to $0.29

Karan A Chanana, Amira's Chairman and Chief Executive Officer, stated, "***Our strong fiscal third quarter performance*** reflects increased demand for our products across categories and geographies.

\* \* \*

Bruce Wacha, Amira's Chief Financial Officer, added, "During our fiscal third quarter, we generated record quarterly revenue, adjusted EBITDA and adjusted EPS which ***represents our tenth consecutive quarter of double digit revenue and profit growth as a public company.*** Our growth in the third quarter was driven primarily by ***volume gains as we build out our distribution around the globe*** and capitalize on the continued demand for healthy, better for you products such as our premium, specialty rice. ***Our Basmati and other specialty rice sales were up significantly in the third quarter***, while revenues also benefited from an increase in our more opportunistic institutional business. Going forward, we continue to see many opportunities in India and around the world to further grow our business and create value for our shareholders."

**Third Quarter Fiscal 2015 Results**

Revenue for the third quarter of fiscal 2015 increased 35.0% to $192.4 million, compared to $142.5 million for same period in fiscal 2014. The revenue increase was primarily due to increased sales volume and product mix in India and internationally. ***Sales***

*in India increased 30.7% to $86.6 million, while sales outside of India, or international sales, increased 38.9% to $105.8 million. Amira branded and third party branded sales increased 29.2% to $176.4 million* and institutional sales increased $10.1 million to $16.0 million.

\* \* \*

**Fiscal 2015 Outlook**

The Company reiterated its previously-issued guidance and *expects full-year fiscal 2015 revenue and adjusted EBITDA growth in excess of 25%.*

\* \* \*

[Emphasis added.]

174.   These statements, repeated in the corresponding conference call,[17] were materially false and misleading because the revenues and financial statements included were overstated and inaccurate, because the Company failed to adequately disclose related party transactions and the effect on revenue fabrication, and because the Company specifically addressed Amira's Basmati, international, and branded revenue inaccurately.

175.   Moreover, the corresponding Q3'15 earnings results presentation (filed on March 2, 2015 with the SEC as Exhibit 99.2 to the Form 6-K) contains a slide[18] titled, "A Deeper Look at ANFI's Sources of Revenue", in which Amira states, "Sales recorded outside of India includes product sourced from Amira India, as well as from 3rd parties in India and internationally."  This is the first time that Amira has publicly disclosed that some sales recorded from outside India are sourced from

---

[17] Attached to the filed Form 6-K as Exhibit 99.3.

[18] Ex. 3 (numbered page 15 of the presentation).

third parties. This is new language that contradicts how the Company has described Amira's business since the Company's IPO.

176.   Moreover, recording sales outside of India from product sourced from (and exported by) third-parties in India is revenue fabrication and a violation of IAS 18.

177.   On the left side of the slide is a very blurry snapshot of pages 47-50 of the Company's last-filed Form 20-F (filed with the SEC on July 28, 2014) with a bar on the top of the snapshot titled "20F: ANFI's Revenue Mix Disclosure." The bullet points on the right of the slide (including the above-mentioned "Sales recorded outside of India includes product sourced from Amira India, as well as from 3rd parties in India and internationally") seem to indicate disclosures that are included in the blurry unreadable snapshot on the left.   This is misleading as there is no disclosure in the 20-F that sales recorded outside of India includes product sourced from third parties in India and internationally.

178.   The fact that Amira is changing the Company's disclosures after the revelations in the PPRG Report 1 is an indication of scienter.   Moreover, Amira's attempt to pretend that the disclosures were in the last Form 20-F is also an indication of guilt and scienter.

179.   On May 8th, 2015, analysts at Zacks downgraded shares of Amira from a "buy" rating to a "hold" rating.   On May 28th, Amira had its price target trimmed by Oppenheimer from $20.00 per share to $17.00 per share.

180.   On July 16, 2015, Amira issued a press release announcing the Company's Full Year Fiscal 2015 and Fourth Quarter Ended March 31, 2015 Financial Results, which stated in part:

**FY 2015 Financial Highlights versus FY 2014:**

- Revenue grew 27.8% to $699.4 million compared to $547.3 million
- Adjusted EBITDA increased 31.9% to $99.5 million compared to $75.5 million
- Adjusted EBITDA margin of 14.2%
- Adjusted profits after tax was $54.3 million compared to $41.0 million
- Adjusted earnings per share ("EPS") was $1.51 compared to $1.14

**Fourth Quarter 2015 Financial Highlights versus Fourth Quarter 2014:**

- Revenue grew 21.6% to $226.8 million compared to $186.6 million
- Adjusted EBITDA increased 25.1% to $33.0 million compared to $26.4 million
- Adjusted EBITDA margin of 14.5%
- Adjusted profits after tax was $18.6 million compared to $16.8 million
- Adjusted earnings per share ("EPS") was $0.52 compared to $0.47

* * *

Bruce Wacha, Amira's Chief Financial Officer, added, "During fiscal 2015, we generated record full year and quarterly revenue, adjusted EBITDA and adjusted EPS which represents ***eleven consecutive quarters of double digit revenue and profit growth as a public company. Our growth in the fourth quarter was driven largely by volume gains as we build out our distribution around the globe*** and capitalize on the continued demand for healthy, better for you products such as our premium, specialty rice. Going forward, we continue to see many opportunities in

India and around the world to further grow our business and create value for our shareholders."

**Full Year Fiscal 2015 Results**

Revenue for the full year of fiscal 2015 increased 27.8% to $699.4 million, compared to $547.3 million in fiscal 2014. The revenue increase was primarily due to increased sales volume and product mix in India and internationally. Sales in India increased 28.0% to $286.8 million, while sales outside of India, or international sales, increased 27.7% to $412.6 million. Amira branded and third party branded sales increased 38.6% to $662.4 million and institutional sales decreased $32.4 million to $36.9 million.

\* \* \*

**Fiscal 2016 Outlook**

The Company ***expects double digit fiscal 2016 revenue*** and adjusted EBITDA growth and maintains its long-term guidance previously provided to the investment community of $1 billion of revenue and $150 million of Adjusted EBITDA. The Company's guidance is based on foreign exchange rates as of March 31, 2015.

[Emphasis added.]

181.   Notably, specific reference to Basmati rice sales (included in previous quarterly earnings announcements) was absent.

182.   These statements were materially false and misleading because the revenues and financial statements included were overstated and inaccurate, because the Company failed to adequately disclose related party transactions and the effect on revenue fabrication, and because the Company specifically addressed Amira's international and branded revenue inaccurately.

183.   The July 16, 2015 earnings results were not accompanied by a filing with the SEC.  On July 21, 2015, Amira's share price dropped over a dollar per share and slid more on July 24 and July 27.

184.   On July 30, 2015, the second Amira report was published by PPRG.

185.   Amira's share price fell another $1.07 per share on July 30, 2015.

186.   The Company did not meet its July 31, 2015 deadline for filing its annual results in a Form 20-F with the SEC.

187.   On August 3, 2015, Amira filed a Form 12b-25, Notification of Late Filing of the Company's 20-F, stating that Amira was unable to file its Annual Report on Form 20-F for the year ended March 31, 2015 on a timely basis "due to the Company requiring additional time to work internally with its staff and externally with its independent auditors to prepare and finalize the Annual Report."

188.   On this news, Amira's share price fell $3.25 per share.

189.   The Company further stated in its Form 12b-25 that Amira anticipated filing the Annual Report no later than the fifteenth calendar day following the prescribed filing date.

190.   The fifteenth calendar day following July 31, 2015 was August 15, 2015 but the Company did not file its Annual Report on August 15.  Moreover, as of the date of the filing of this Complaint, Amira has still not filed its Annual Report.

191.   On August 11, 2015, Amira announced that the Company had retained the law firm Kasowitz, Benson, Torres & Friedman, LLP   ("Kasowitz") to investigate and pursue claims against PPRG and related parties and that Amira had filed a lawsuit against PPRG, Prescience Investment Group, LLC, Spruce Point

Capital Management, LLC, Ben Axler, and Eiad Asbahi in Supreme Court, New York County.

192.   Although there is a docket and summons (with notice) for this matter (*Amira Nature Foods, LTD. v. Prescience Point Research Group LLC et al*, 652775/2015, New York County Supreme Court), despite it being over a month since the docket was created, no complaint was ever filed and no complaint was ever sent to PPRG.  *See* Ex. 4 (NY docket).

193.   On August 18, 2015, BMO cut its rating on Amira from Outperform to Market Perform.  The Amira stock price dropped $2.34 per share on this day.

194.   On August 19, 2015, after the close of trading, Amira issued a press release announcing that the Company had hired a new auditor and the Audit Committee of the Board of Directors of Amira had "elected to appoint an independent external investigative firm."

195.   The corresponding Form 6-K filed with the SEC revealed that the Company had terminated its auditor Deloitte and instead engaged India-based ASA & Associates LLP, stating in relevant part:

> **Changes in Registrant's Certifying Accountant**
>
> On August 19, 2015, the Audit Committee of Amira Nature Foods Ltd. (the "Company") appointed ASA & Associates LLP as the Company's independent registered public accounting firm for the year ended March 31, 2015, effective immediately, and ASA & Associates LLP accepted the engagement on August 19, 2015.

Simultaneously with the engagement of ASA & Associates LLP, the Company terminated Deloitte Haskins & Sells LLP ("Deloitte") as its independent registered public accounting firm.

\* \* \*

**Deloitte Haskins & Sells LLP <u>requested the Audit Committee retain independent external forensic investigators to conduct an investigation into (i) the issues raised in a short seller report dated July 30, 2015 and (ii) other transactions identified by Deloitte Haskins & Sells LLP</u> in connection with its incomplete audit of the Company's financial statements for the year ended March 31, 2015**. Deloitte Haskins & Sells LLP also communicated to the Audit Committee that it would need to evaluate its responsibility under Section 10A of the U.S. Securities Exchange Act of 1934 if the Audit Committee were to fail to take timely and appropriate action in response to the matters identified above.  Because Deloitte Haskins & Sells LLP was terminated prior to the Audit Committee commencing an investigation, Deloitte Haskins & Sells LLP has informed the Company that it cannot determine: 1) whether the Audit Committee took timely and appropriate action with respect to the matters identified above; 2) whether the information obtained from an investigation would materially impact previously issued audit report or underlying financial statements for fiscal years ended March 31, 2014 and 2013; or 3) whether the information obtained from an investigation would cause Deloitte Haskins & Sells LLP to be unwilling to rely on management's representations. Accordingly, Deloitte Haskins & Sells LLP has advised the Company that it is not able to reissue its report or issue a consent to its inclusion in filings of the Company with the United States Securities and Exchange Commission.

[Emphasis added.]

196.   It took the demands of the Company's (now former) auditor to force Amira into action.   That Amira has now appointed an independent external investigative firm to investigate, among other things, the allegations contained in PPRG's Reports, is an indication that Amira's Board of Directors has reasonable

doubts concerning the accuracy of previous Amira statements on the subjects covered by PPRG.  It is also highly relevant that Deloitte identified "other transactions," in addition to PPRG's information, that require investigation, which would be uncovered through discovery, if not otherwise revealed.

197.   On August 19, 2015, the Amira stock price dropped $.57 per share and on August 20, 2015, the Amira stock price dropped $1.81 per share.  The total Amira stock price drop from August 18, 2015 through August 20, 2015 was $4.72 per share.

198.   On August 21, 2015, despite having appointed an independent external investigative firm, Amira announced that the Company rejects the claims made by PPRG and remains confident in the previously announced financial results.

199.   Also on Friday August 21, 2015, a consent to substitute counsel in Amira's NY Supreme Court case against PPRG was signed.  This consent was filed on August 26, 2015 and Kasowitz was replaced.  However, a complaint has still not been filed in Amira's NY matter.

200.   On August 29, 2015, S&P pulled its ratings on Amira.

201.   On September 14, 2015, Amira announced that it expects to file its 20-F "as soon as practical."  Amira's stock price closed at $3.97 per share on September 16, 2015 having traded at a high of $25.00 per share on February 21, 2014.

## V.    CLASS ACTION ALLEGATIONS

202.   Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all persons other

than Defendants who purchased or otherwise acquired the securities of Amira pursuant and/or traceable to the Company's Registration Statement and Prospectus issued in connection with the Company's IPO or purchased or otherwise acquired securities of Amira during the Class Period. Excluded from the Class are the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

203.    The members of the Class are so numerous that joinder of all members is impracticable.    Throughout the Class Period, the Company's securities was actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds of members in the proposed Class and as of March 31, 2014, Amira had 36,401,966 ordinary shares outstanding. Members of the Class may be identified from records maintained by Amira or its transfer agent, and may be notified of the pendency of this action by mail using a form of notice customarily used in securities class actions.

204.    Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal laws that are complained of herein.

205.   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

206.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants acts as alleged herein;

(b)  whether statements made by the Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, and management of Amira;

(c) whether the Registration Statement contained material misstatement(s) and/or omission(s) of material facts; and

(d) to what extent the members of the Class have sustained damages, and the proper measure of damages.

207.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

208.   The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications with respect to the individual Class members, which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual Class members that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair their ability to protect their interests.

209.   Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## VI.   LOSS CAUSATION

210.   Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

211.   During the Class Period, Plaintiff and the Class purchased securities of Amira at artificially inflated prices and were damaged thereby. The price of Amira securities declined when the material misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## VII.   SCIENTER ALLEGATIONS

212.   As alleged herein, the Defendants acted with scienter in that Defendants knew or recklessly disregarded that the public documents and statements issued or disseminated in the  name of Amira were materially false and misleading; knew or

recklessly disregarded, that  such statements or documents would be issued or disseminated to the investing public; and knowingly participated or acquiesced in the issuance or dissemination of such statements or  documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Defendants, by virtue of their receipt of information reflecting the true condition of Amira's business operations and future prospects, their control over, and/or receipt and/or modification of Amira's allegedly materially misleading misstatements and/or their associations with Amira, which made them privy to confidential proprietary information concerning Amira, participated in the wrongful conduct alleged herein.

## VIII.  APPLICABILITY OF PRESUMPTION OF RELIANCE THROUGH FRAUD-ON-THE-MARKET DOCTRINE

213.   At all relevant times, the market for Amira's securities was an efficient market for the following reasons, among others:   (a) Amira's stock met the requirements for listing, and was listed and actively traded on the NYSE, which is a highly efficient and automated market; (b) as a regulated issuer, Amira filed periodic public reports with the SEC and the NYSE; (c) Amira regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and (d) Amira was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers

of their respective brokerage firms during the Class Period.  Each of these reports was publicly available and entered the public marketplace.

214.   As a result of the foregoing, the market for Amira's securities promptly digested current information regarding Amira from all publicly available sources and reflected such information in Amira's stock price.  Under these circumstances, all purchasers of Amira's securities during the Class Period suffered similar injury through their purchase of Amira's securities at artificially inflated prices, and a presumption of reliance applies.

**Applicability of Presumption of Reliance:**
***Affiliated Ute***

215.   Neither Plaintiff nor the Class (defined herein) need prove reliance – either individually or as a class – because under the circumstances of this case, which involve omissions of material fact as described above, positive proof of reliance is not a prerequisite to recovery, pursuant to the ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 1456, 31 L. Ed. 2d 741 (1972).  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

## IX.   NO SAFE HARBOR

216.   Amira's "Safe Harbor" warnings accompanying its oral forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.  To the extent that projected revenues and earnings

were included in the Company's financial reports prepared in accordance with Generally Accepted Accounting Principles ("GAAP"), including those filed with the SEC on Form 8-K, they are excluded from the protection of the statutory Safe Harbor.

217.   The Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Amira who knew that the FLS was false.

218.   None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## X.    CAUSES OF ACTION

### COUNT I
### Violations of Section 10(b) of the Exchange Act
### and Rule 10b-5 Promulgated Thereunder
### Against Amira and the Individual Defendants

219.   Plaintiff repeats and realleges the allegations set forth above as if set forth fully herein.

220.   During the Class Period, the Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (2) cause Plaintiff and other members of the Class to purchase Amira's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, the Defendants, both collectively and individually, took the actions set forth herein.

221.   Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of Amira's securities in an effort to maintain artificially high market prices for Amira's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

222.   Defendants, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Amira as specified herein.

223.   Defendants employed devices, schemes, and artifices to defraud while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors

of Amira's value and performance and continued substantial growth, which included the making of, or participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Amira and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of Amira's securities during the Class Period.

224. Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available. Such material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Amira's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by overstatements and misstatements of Amira's financial condition throughout the Class Period, if the Defendants did not have actual knowledge of the misrepresentations and omissions alleged, they were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false and misleading.

225.   As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Amira's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of Amira's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by the Defendants, or upon the integrity of the market in which the securities trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by the Defendants, but not disclosed in public statements by the Defendants during the Class Period, Plaintiff and the other members of the Class acquired Amira securities during the Class Period at artificially high prices, and were, or will be, damaged thereby.

226.   At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding Amira's financial results, which was not disclosed by the Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Amira securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices that they paid.

227.   As a direct and proximate result of the Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of Amira's securities during the Class Period.

**COUNT II**
**Violations of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

228.   Plaintiff repeats and realleges the allegations set forth above as if set forth fully herein.

229.   The Individual Defendants acted as controlling persons of Amira within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, agency, and their ownership and contractual rights, participation in and/or awareness of Amira's operations and/or intimate knowledge of the false financial statements filed by Amira with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Amira, including the content and dissemination of the various statements that plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of Amira's reports, press releases, public filings and other statements alleged by Plaintiff to have been misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

230.   In particular, each Individual Defendant had direct and supervisory involvement in the day-to-day operations of Amira and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

231.   As set forth above, the Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.

232.   By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.   As a direct and proximate result of the defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of Amira securities during the Class Period.

### COUNT III
### Violations of Section 11 of the Securities Act
### Against Amira, Chanana, Suneja,
### and the Underwriter Defendants

233.   Plaintiff repeats and realleges allegations contained above, and particularly in Section IV. G., as if fully set forth herein.

234.   This claim is not based on and does not sound in fraud.  For the purposes of this Section 11 claim, Plaintiff does not allege that any Defendant acted with scienter or fraudulent intent, which are not elements of a claim under Section 11 of the Securities Act.

235.    This claim is brought against the Defendants Amira, Chanana, Suneja, and the Underwriter Defendants pursuant to Section 11 of the Securities Act, 15

U.S.C. § 77k, on behalf of all proposed Class members who acquired Amira shares pursuant to or traceable to the Company's Offering, and were damaged thereby.

236.   Plaintiff and other members of the Class purchased the common stock of Amira pursuant to or traceable to the Registration Statement.

237.   Plaintiff purchased the common stock of Amira in reliance on, among other things, the untrue statements in the Registration Statement or in reliance upon the Registration Statement and not knowing of any material omissions.

238.   At the time of the IPO, the Registration Statement, including the Prospectus, contained untrue statements of material fact, omitted to state facts necessary to make the statements made therein not misleading, and failed to disclose required material information, as set forth above in Section IV.G.

239.   Amira is the issuer of the securities through the Registration Statement and Prospectus.   As the issuer of the stock, Amira is strictly liable to the members of the Class who purchased common stock in or traceable to the IPO for the materially untrue statements and omissions that appeared in or were omitted from the Registration Statement.

240.   Defendants Chanana and Suneja were signatories of the untrue and misleading Registration Statement, and Chanana was a director of Amira at the time of the IPO.

241.   The Underwriter Defendants were underwriters of the IPO.

242.   All the Defendants named in this Count owed to the purchasers of the shares obtained through the Registration Statement and Prospectus the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement and Prospectus at the time they became effective to ensure that such statements were true and correct and that there was no omission of material facts required to be stated in order to make the statements contained therein not misleading.

243.   Defendants issued and disseminated, caused to be issued and disseminated, and participated in the issuance and dissemination of, material misstatements to the investing public that were contained in the Registration Statement and Prospectus, which misrepresented or failed to disclose, among other things, the facts set forth above.   By reason of the conduct alleged herein, each Defendant named in this Count violated and/or controlled a person who violated Section 11 of the Securities Act.

244.   Plaintiff and other members of the Class did not know, or in the exercise of reasonable diligence could not have known, of the inaccurate statements and omissions contained therein when they purchased or otherwise acquired the common stock of Amira.

245.   This action is brought within one year after discovery of the untrue statements and omissions in and from the Registration Statement and Prospectus that should have been made and/or corrected through the exercise of reasonable

diligence, and within three years after the security was bona fide offered to the public.

246.   By virtue of the foregoing, the Defendants named in this Count have violated Section 11 of the Securities Act and Plaintiff and the other members of the Class are entitled to damages under Section 11, from the named Defendants and each of them, jointly and severally.

**COUNT IV**
**Violations of Section 15 of the Securities Act**
**Against Defendants Chanana and Suneja**

247.   Plaintiff repeats and realleges allegations contained above, particularly in Section IV. G., and excluding all allegations that contain facts necessary to prove any elements not required to state a Section 15 claim, including without limitation, scienter.

248.   This claim does not sound in fraud.  For the purposes of this Section 15 claim, Plaintiff does not allege that any Defendant acted with scienter or fraudulent intent, which are not elements of a claim under Section 15 of the Securities Act.

249.   This Count is asserted against Defendants Chanana and Suneja and  and is based upon Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of all members of the Class who purchased or otherwise acquired the common stock issued pursuant to the Registration Statement.

250.   Plaintiff purchased the common stock of Amira in reliance on, among other things, the untrue statements in the Registration Statement or in reliance upon

the Registration Statement and not knowing of any material omissions.

251.   Defendants Chanana and Suneja by virtue of their offices, directorships and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Amira within the meaning of Section 15 of the Securities Act during the relevant time period.  Defendants Chanana and Suneja had the power and influence and exercised the same to cause Amira to engage in the acts described herein.  Each of these Defendants was in a position to control and did in fact control Amira and the issuance of the false and misleading statements and omissions contained in the Registration Statement and Prospectus.

252.   As officers and/or directors of a company engaging in an IPO, Defendants Chanana and Suneja had a duty to disseminate accurate and truthful information with respect to Amira's business, financial condition and results of operations.  These Defendants participated in the preparation and dissemination of the Registration Statement and Prospectus, and otherwise participated in the process necessary to conduct the IPO.  Because of their positions of control and authority as senior officers and/or directors of Amira, these Defendants were able to, and did, control the contents of the Registration Statement and Prospectus, which contained materially untrue information and failed to disclose material facts.

253.   This claim was brought within one year after Plaintiff discovered or reasonably could have discovered the untrue statements and omissions in the Registration Statement that should have been made and/or corrected through the

exercise of reasonable diligence, and within three years after the security was bona fide offered to the public.

254.   By virtue of the conduct alleged herein, Defendants Chanana and Suneja are jointly and severally liable for the aforesaid wrongful conduct and are liable to Plaintiff and the Class for damages suffered with and to the same extent as Amira is liable under Sections 11 of the Securities Act.

## XI.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a) Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding compensatory damages in favor of Plaintiff and the other Class members against Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

1

## JURY DEMAND

2

Plaintiff hereby demands trial by jury on all claims asserted herein.

3

4    DATED:  September 17, 2015          Respectfully submitted,

5                                        /s/  *Robert S. Green*

6                                        ROBERT S. GREEN

7                                        **GREEN & NOBLIN, P.C.**
                                         4500 East Pacific Coast Highway
8                                        Fourth Floor
                                         Long Beach, California 90804
9                                        Telephone: (562)391-2487
                                         Facsimile: (415) 477-6710
10                                       Email: gnecf@classcounsel.com

11

12                                       -and-

13                                       2200 Larkspur Landing Circle, Suite 101
                                         Larkspur, CA 94939
14                                       Telephone: (415) 477-6700
                                         Facsimile: (415) 477-6710
15                                       Email: gnecf@classcounsel.com

16

17                                       *Local Counsel for the Proposed Class*

18

19                                       Peter Safirstein
                                         Domenico Minerva
20                                       Elizabeth Metcalf
                                         **MORGAN & MORGAN, P.C.**
21                                       28 W. 44th St., Suite 2001
                                         New York, NY  10036
22                                       Telephone: (212) 564-1637
                                         Facsimile: (212) 564-1807
23                                       Email: psafirstein@MorganSecLaw.com
24                                       Email: dminerva@MorganSecLaw.com
                                         Email: emetcalf@MorganSecLaw.com
25

26                                       *Attorneys for Plaintiff and Lead Counsel*
                                         *for the Proposed Class*
27

28