**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ROBERT REED, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>AMIRA NATURE FOODS LTD., et al.,<br><br>Defendants. | Case No. CV 15-0957 FMO (PJWx)<br><br>**ORDER RE: DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT** |

Having reviewed and considered all the briefing filed with respect to defendants' motions to dismiss, the court concludes that oral argument is not necessary to resolve them. See Fed. R. Civ. P. 78; Local Rule 7-15; Willis v. Pac. Mar. Ass'n, 244 F.3d 675, 684 n. 2 (9th Cir. 2001).

**INTRODUCTION**

Lead plaintiff Steamfitters Local 449 Pension Plan, on behalf of a class of purchasers of Amira stock ("plaintiffs"), filed their Second Amended Complaint for Violations of the Federal Securities Laws (Dkt. 77, "SAC") against: (1) entity defendant Amira Nature Foods Ltd. ("Amira"); (2) Amira's CEO and majority shareholder, Karan A. Chanana ("Chanana"), and a succession of Amira's CFOs, Bruce C. Wacha ("Wacha") (June 2, 2014 to present), Ashish Poddar ("Poddar") (November 11, 2012 to May 1, 2014), and Ritesh Suneja ("Suneja") (October 10, 2012 to November 20, 2012);[1] and (3) the underwriters of Amira's October 10, 2012 initial public offering

[1] Collectively, Chanana, Wacha, Poddar, and Suneja are referred to as the "individual defendants," and with Amira, the "Amira defendants."

("IPO"), UBS Securities LLC ("UBS"), Deutsche Bank Securities Inc. ("Deutsche Bank"), Jefferies & Co., Inc. ("Jefferies"), and KeyBanc Capital Markets Inc. ("KeyBanc").[2] (See Dkt. 77, SAC at ¶¶ 28-32, 34-37 & 47).

The Amira defendants filed a motion to dismiss the SAC. (See Dkt. 96, [Amira Defendants'] Motion to Dismiss Second Amended Complaint ("Amira's Motion")). The underwriter defendants filed a joinder to Amira's Motion and their own motion to dismiss the SAC. (See Dkt. 100, Joinder in Amira Defendants' Motion and Motion of Underwriter Defendants[] to Dismiss Second Amended Complaint ("Underwriters' Motion")).

Plaintiffs assert four federal securities violations on behalf of a class of purchasers from October 10, 2012 to August 20, 2015 ("class period"): (1) §10(b) of the Securities Exchange Act of 1934 ("1934 Act") and Rule 10b-5 promulgated thereunder against the Amira defendants; (2) § 20(a) of the 1934 Act for control person liability against the individual defendants; (3) § 11 of the Securities Act of 1933 ("1933 Act") against Amira, Chanana, Suneja, and the underwriter defendants; and (4) § 15 of the 1933 Act for control person liability against Chanana and Suneja. (See Dkt. 77, SAC at ¶¶ 1 & 219-254).

## ALLEGATIONS IN THE SECOND AMENDED COMPLAINT

Amira is a global provider of packaged specialty rice, primarily Basmati rice, and other food products. (See Dkt. 77, SAC at ¶¶ 2 & 28). Amira processes, markets, and sells rice and other food products (including snacks, ready-to-heat meals, and a line of organic product offerings) under the Amira brand, as well as under other third party brands. (See id. at ¶¶ 28 & 43).

Amira is a British Virgin Islands corporation, with its principal offices located in Dubai, United Arab Emirates. (See Dkt. 77, SAC at ¶ 28). While most of Amira's employees are based in India, Amira also has an office in Irvine, California. (See id. at ¶¶ 28 & 45; see also id. at ¶¶ 46 & 47 (describing Amira's corporate structure and subsidiaries)).

Plaintiffs allege that Amira overstated its revenue for exported Basmati rice by $116.9

[2] Collectively, UBS, Deutsche Bank, Jefferies, and KeyBanc are referred to as the "underwriter defendants."

million in the 2013 fiscal year ("FY '13") and by $99.5 million in the 2014 fiscal year ("FY '14"), thus rendering Amira's statements regarding overall revenue materially false and misleading, (see Dkt. 77, SAC at ¶ 92), in its: (1) September 27, 2012 Form F-1 (see Dkt. 96-3, Declaration of Shahin Rezvani in Support of [Amira Defendants'] Motion to Dismiss Second Amended Complaint ("Rezvani's Decl.") at Exhibit ("Exh.") B ("Prospectus")); (2) June 13, 2013 Form 20-F (see Dkt. 96-3, Rezvani's Decl. at Exh. C ("'13 Form 20F"); and (3) July 28, 2014 Form 20-F. (See Dkt. 96-3, Rezvani's Decl. at Exh. A ("'14 Form 20F"). According to plaintiffs, Amira is not required to report exported Basmati rice revenue in its filings with the Securities and Exchange Commission ("SEC"). (See Dkt. 77, SAC at ¶ 88) (Amira "does not disclose how much revenue it derives from Basmati rice **exports**" in its filings with the SEC) (emphasis in original). Rather, plaintiffs put forth a series of assumptions and calculations to derive Amira's implicitly reported revenue for exported Basmati rice. (See id. at ¶¶ 86-92).

Plaintiffs' methodology and calculations derive from two reports issued by the Prescience Point Research Group ("Prescience") on February 9, 2015, (see Dkt. 77-1, SAC at Exh. 1 ("First Report")) and July 30, 2015, (see Dkt. 77-2, SAC at Exh. 2 ("Second Report")). (See Dkt. 77, SAC at ¶¶ 5 & 11). At the time it issued the two Reports, Prescience disclosed that it held a short position in Amira and as such, "st[ood] to realize significant gains in the event that the price of its stock declines." (Dkt. 77-1, First Report at 3; Dkt. 77-2, Second Report at 3). Prescience also disclosed that, "[t]o the best of [its] ability and belief, as of the date hereof, all information contained [in the Reports] is accurate and reliable and does not omit to state material facts necessary to make the statements herein not misleading, and all information has been obtained from public sources [Prescience] believe[s] to be accurate and reliable[.]" (Dkt. 77-1, First Report at 3; Dkt. 77-2, Second Report at 3; see Dkt. 77, SAC at ¶ 5 n. 1 (alleging that Prescience holds a short position in Amira stock)).

In addition to revenue from exported Basmati rice, plaintiffs allege that Amira overstated its non-exported Basmati rice revenue; in other words, revenue from sales of Basmati rice within India. (See Dkt. 77, SAC at ¶¶ 103-109). Again, plaintiffs' allegations rely on Prescience's analysis in the First and Second Reports by comparing Amira to Indian Basmati rice companies,

principally KRBL. (See id.).

On February 9, 2015, the day Prescience's First Report was issued, Amira's stock closed at $9.95 per share, falling $3.45 per share, or almost 26% from February 6, 2015, when the stock closed at $13.40 per share. (See Dkt. 77, SAC at ¶ 9). On July 30, 2015, the day Prescience's Second Report was issued, Amira's stock closed at $11.82 per share, falling $1.07 per share, or almost 16% from July 30, 2015, when the stock closed at $12.89 per share. (See id. at ¶ 11).

On August 3, 2015, Amira filed a Form 12b-25 with the SEC, stating that it was unable to file its Form 20F for fiscal year 2015. (See Dkt. 77, SAC at ¶ 12). That day, Amira's stock closed at $9.01 per share, falling $3.25 per share, or almost 26% from July 31, 2015, when the stock closed at $12.26 per share. (See id. at ¶ 13).

On August 19, 2015, Amira announced that it had terminated its auditor, Deloitte Haskins & Sells LLP ("Deloitte") and had hired an India-based auditor, ASA & Associates LLP.[3] (See Dkt. 77, SAC at ¶¶ 16-17). On the same day, Amira announced that its audit committee "elected to appoint an independent external investigative firm." (Id. at ¶ 16) (internal quotation marks omitted). On August 20, 2015, Amira stock closed at $2.84 per share, falling $1.81 per share or almost 39% from August 19, 2015 when the stock closed at $4.65 per share. (See id. at ¶ 19).

Finally, plaintiffs allege that Amira did not adequately disclose: (1) its relationship and transactions with Karam Enterprises, an entity controlled by the father of Karan Chanana, Amira's CEO; (2) its related party transactions with other affiliates; (3) a contemplated $30 million real estate transaction with entities controlled by Chanana's family and affiliates; and (4) Chanana's personal expenses. (See Dkt. 77, SAC at ¶¶ 110-143). Like the allegations regarding Amira's purported overstatement of revenues, plaintiffs' allegations principally rely on Prescience's First and Second Reports. (See id.).

## LEGAL STANDARD

A motion to dismiss for failure to state a claim should be granted if plaintiff fails to proffer

---

[3] Prior to its termination, Deloitte requested that Amira's audit committee conduct an investigation into the issues raised in Prescience's First Report as well as other transactions. (See Dkt. 77, SAC at ¶ 18).

"enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 1974 (2007); see Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 1949 (2009); Cook v. Brewer, 637 F.3d 1002, 1004 (9th Cir. 2011). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678, 129 S.Ct. at 1949; Cook, 637 F.3d at 1004; Caviness v. Horizon Cmty. Learning Ctr., Inc., 590 F.3d 806, 812 (9th Cir. 2010). Although the plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do," Twombly, 550 U.S. at 555, 127 S.Ct. at 1965; see Iqbal, 556 U.S. at 678, 129 S.Ct. at 1949; Cholla Ready Mix, Inc. v. Civish, 382 F.3d 969, 973 (9th Cir. 2004), cert. denied, 544 U.S. 974 (2005) ("[T]he court is not required to accept legal conclusions cast in the form of factual allegations if those conclusions cannot reasonably be drawn from the facts alleged. Nor is the court required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences.") (citations and internal quotation marks omitted), "[s]pecific facts are not necessary; the [complaint] need only give the defendant[s] fair notice of what the . . . claim is and the grounds upon which it rests." Erickson v. Pardus, 551 U.S. 89, 93, 127 S.Ct. 2197, 2200 (2007) (per curiam) (citations and internal quotation marks omitted); see Twombly, 550 U.S. at 555, 127 S.Ct. at 1964.

In considering whether to dismiss a complaint, the court must accept the allegations of the complaint as true, Erickson, 551 U.S. at 93-94, 127 S.Ct. at 2200; Albright v. Oliver, 510 U.S. 266, 268, 114 S.Ct. 807, 810 (1994), construe the pleading in the light most favorable to the pleading party, and resolve all doubts in the pleader's favor. See Jenkins v. McKeithen, 395 U.S. 411, 421, 89 S.Ct. 1843, 1849 (1969); Berg v. Popham, 412 F.3d 1122, 1125 (9th Cir. 2005). Nevertheless, dismissal for failure to state a claim can be warranted based on either a lack of a cognizable legal theory or the absence of factual support for a cognizable legal theory. See Mendiondo v. Centinela Hosp. Med. Ctr., 521 F.3d 1097, 1104 (9th Cir. 2008). A complaint may also be dismissed for failure to state a claim if it discloses some fact or complete defense that will necessarily defeat the claim. Franklin v. Murphy, 745 F.2d 1221, 1228-29 (9th Cir. 1984).

## DISCUSSION[4]

To state a claim under the 1934 Act, a plaintiff must meet the "exacting pleading standards of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act[, 15 U.S.C. § 78u-4 ('Reform Act').]" Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc., 774 F.3d 598, 604 (9th Cir. 2014); Rubke v. Capitol Bancorp Ltd, 551 F.3d 1156, 1164 (9th Cir. 2009) ("At the pleading stage, a complaint stating claims under section 10(b) and Rule 10-5 must satisfy the dual pleading requirements of Federal Rule of Civil Procedure 9(b) and the PSLRA."). Under the Reform Act, plaintiffs "shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Additionally,"the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). Finally, "the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4).

Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." This includes "the who, what, when, where, and

---

[4] The Amira and underwriter defendants seek judicial notice of multiple documents. (See Dkt. 96-4, [Amira Defendants'] Request for Judicial Notice in Support of Their Motion to Dismiss Second Amended Complaint ("Amira's Motion RJN"); Dkt. 112, [Amira Defendants'] Request for Judicial Notice in Support of Their Reply in Support of Their Motion to Dismiss Second Amended Complaint ("Amira's Reply RJN"); Dkt. 113-1, Request for Judicial Notice in Support of Underwriter Defendants' Reply in Support of Joinder and Motion to Dismiss Second Amended Complaint ("Underwriter's RJN")). Plaintiffs do not oppose any of the requests for judicial notice. (See, generally, Dkt.). In any event, because the court may consider "any matter subject to judicial notice, such as SEC filings," Northstar Fin. Advisors Inc. v. Schwab Invs., 779 F.3d 1036, 1043 (9th Cir.), as amended on denial of reh'g and reh'g en banc (Apr. 28, 2015), cert. denied, 136 S. Ct. 240 (2015), the court takes judicial notice of the following: (1) Amira's Prospectus; (2) '13 Form 20F; (3) '14 Form 20F; and (4) January 28, 2015 Form 6K. (See Dkt. 96-3, Prospectus; '13 Form 20F; '14 Form 20F; and Exh. F ("Jan. 2015 Form 6K"). Also, because the court does not rely on the remaining documents for which defendants seek judicial notice, the court denies those requests as moot.

how of the misconduct charged." Kearns v. Ford Motor Co., 567 F.3d 1120, 1124 (9th Cir. 2009) (internal quotation marks omitted). "The plaintiff must set forth what is false or misleading about a statement, and why it is false." Yourish v. Calif. Amplifier, 191 F.3d 983, 993 (9th Cir. 1999). This requirement "can be satisfied by pointing to inconsistent contemporaneous statements or information (such as internal reports) which were made by or available to the defendants." Rubke, 551 F.3d at 1161 (internal quotation marks omitted).

I. SECTION 10(b) OF THE 1934 ACT.

Securities fraud claims under the 1934 Act, "resemble[], but [are] not identical to, common-law tort actions for deceit and misrepresentation." Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 341, 125 S.Ct. 1627, 1631 (2005). Section 10(b) of the 1934 Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Rule 10b–5, which implements § 10(b), prohibits the following practices "in connection with the purchase or sale of any security": "(a) [t]o employ any device, scheme, or artifice to defraud, (b) [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person[.]" 17 C.F.R. § 240.10b–5. "The elements of a private securities fraud claim based on violations of § 10(b) and Rule 10b-5 are: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." Erica P. John Fund, Inc. v. Halliburton Co., 563 U.S. 804, 809-10, 131 S. Ct. 2179, 2184 (2011) (internal quotation marks omitted).

A. Material Misrepresentations or Omissions.

Plaintiffs identify multiple statements in Amira's SEC filings that they claim falsely overstate its revenues. (See, e.g., Dkt. 77, SAC at ¶¶ 150-151 (Prospectus); ¶ 155 ('13 Form 20F); ¶ 159

('14 Form 20F); ¶¶ 162-163 (August 28, 2014 and November 24, 2014 6Ks); see also id. at ¶¶ 153, 156, 160 & 164).

1. **Overstatement of International Basmati Rice Revenue**.

Plaintiffs allege that Amira overstated its revenue for FY '13, (see Dkt. 96-3, '13 Form 20F at 42, 44 & 48) and FY '14. (See Dkt. 96-3, '14 Form 20F at 42 & 47). According to plaintiffs, relying on Prescience's First and Second Reports, India's Agricultural and Processed Food Products Export Development Authority ("APEDA"), which is the governing body overseeing agricultural exports in India, (see Dkt. 77, SAC at ¶ 64), reports that Amira exported from India $68 million Basmati rice FOB in FY '13 and $87.3 million Basmati rice FOB in FY '14. (See Dkt. 77-1, First Report at 8). Given APEDA's report of Amira's Basmati rice FOB, plaintiffs contend that Amira's statements regarding its revenue from international sales must be false. (See Dkt. 77, SAC at ¶ 92).

Because revenue from "international sales" encompasses the sale of "exported Basmati rice FOB" as well as other products, plaintiffs claim that they can derive the amount of "exported Basmati rice FOB" Amira implicitly reports to the SEC and then compare that number to APEDA's numbers. (See SAC at ¶¶ 86 & 92). First, like Prescience, plaintiffs subtract Amira's institutional sales[5] from Amira's overall revenue. (See id. at ¶¶ 86, 89 & 92; Dkt. 77-1, First Report at 8; Dkt. 96-3, '13 Form 20F at 48 ($413.7 million - $7.4 million = $406.3 million); Dkt. 96-3, '14 Form 20F at 47 ($547.3 million - $69.4 million = $477.9 million)). According to plaintiffs, subtracting institutional sales from overall revenue is appropriate because defendant Wacha stated during a shareholder conference call that the "institutional business is non-India[,]" and can be "back[ed-]out" when deriving international Basmati rice sales. (Dkt. 77, SAC at ¶ 89; see id. at ¶ 86; Dkt. 77-1, First Report at 8).

Second, relying on Prescience's methodology (but not the precise calculations), plaintiffs derive Amira's revenue from sales of Basmati rice and non-Basmati Rice. (See Dkt. 77, SAC at

---

[5] Institutional sales "primarily consists of the opportunistic sale of bulk commodities, including: wheat, barley, legume, maize, sugar, soybean meal, onion, potato and millet – sold to large international and regional trading firms." (Dkt. 77, SAC at ¶ 49).

¶ 88). Plaintiffs accomplish this by applying Amira's percentages in SEC filings that in FY '13 and FY '14, 76.1% and 65.2%, respectively, of Amira's revenue derive from sales of Basmati rice. (See Dkt. 77, SAC at ¶¶ 86, 88 & 92; Dkt. 77-1, First Report at 8; Dkt. 96-3, '13 Form 20F at 42 (.761 x $406.3 million = $309.2 million); Dkt. 96-3, '14 Form 20F at 42 (.652 x $477.9 million = $311.6 million). Plaintiffs contend that this calculation removes Amira's revenue from sales of non-Basmati rice products. (See Dkt. 77, SAC at ¶ 88) ("The Company discloses total Basmati rice revenue as a percentage of total revenue (e.g. 76.1% of total 2013 revenue which is equal to $314.8 million[.]"). Thus, plaintiffs allege that Amira reported revenue of $309.2 million in FY '13 and $311.6 million in FY '14 from Basmati rice sales. (See id. at ¶ 92).

Then, again relying on Prescience's methodology (but not the precise calculations), plaintiffs rely on Wacha's statement that revenue from international sales comprise 60% of Amira's total revenue. (See Dkt. 77, SAC at ¶¶ 86, 88 & 92; Dkt. 77-1, First Report at 8) (FY '13: $309.2 million x .60 = $185.5 million; FY '14: $311.6 million x .6 = $187.0 million). According to plaintiffs, Amira reported to the SEC that its revenue from international Basmati rice sales was $185.5 million in FY '13 and $187.0 million in FY '14, (see Dkt. 77, SAC at ¶ 92), which would mean that Amira's reported revenue from Basmati rice sales within India was $123.7 million in FY '13 and $124.6 million in FY '14. Having completed these calculations, plaintiffs compare these numbers to those provided by APEDA and contend that Amira overstated its revenue from international sales of Basmati rice by $116.9 million in FY '13 and by $99.6 million in FY '14. (See Dkt. 77, SAC at ¶ 92) (FY '13: $185.5 million - $68.6 million = $116.9 million) (FY '14: $187.0 million - $87.4 million = $99.6 million).

For purposes of this Order, the court will assume that plaintiffs' calculations accurately derive Amira's "exported Basmati rice FOB." However, even if these calculations are accurate, plaintiffs still fail to make a like-for-like comparison. They do not explain why Amira's implicit statement to the SEC that it achieved $185.5 million and $187.0 million in revenue from international Basmati rice sales in FY '13 and FY '14 is in any way comparable to APEDA's $68.6 million and $87.4 million in Basmati rice FOB exports from India. (See, generally, Dkt. 77, SAC; Dkt. 105, Lead Plaintiff's Memorandum of Points and Authorities in Opposition to Defendants'

Motion to Dismiss ("Opp.")).

Plaintiffs allege that "[t]he value of Basmati FOB on a ship leaving India should closely correspond with revenue generated when it is later sold on the international market." (Dkt. 77, SAC at ¶ 67). However, plaintiffs have not provided any explanation why the value of Basmati rice exported from India should closely correspond to the prices charged for the sale of Basmati rice internationally. (See, generally, Dkt. 77, SAC; Dkt. 105, Opp.). Indeed, plaintiffs' speculative assertion is undermined by their acknowledgment that "Amira performs incremental value-added activities outside of India" such that the value of Basmati rice FOB should not correspond with Amira's revenue from international sales of Basmati rice. (See id. at ¶ 70). Nor do plaintiffs explain why, if Amira does in fact perform incremental value-added activities outside India, Amira's reported revenue from international Basmati rice sales should "still very closely tie up in value with the APEDA export data for Amira Pure Foods." (See id. at ¶ 71).

Plaintiffs also allege that "[a]ll Basmati sold internationally by Amira is sourced from and exported by Amira India." (Dkt. 77, SAC at ¶ 69); (see also id. at ¶ 72 ("Given that all Basmati product passes through Amira India's facility[.]"). However, plaintiffs' allegations are undermined by their statement that, even if Amira does source some of its Basmati rice outside India, "[i]t is immaterial[.]" (Id. at ¶ 97). In short, the court will dismiss this claim with leave to amend. In amending their SAC, plaintiffs must state with particularity why they believe that all of Amira's Basmati rice is sourced within India, and why, if it is not, the fact that Amira sources some Basmati rice outside of India is "immaterial."[6]

2. **Overstatement of India Basmati Rice Revenue**.

In addition to revenue from international Basmati rice sales, plaintiffs allege that Amira overstated its revenue from sales of Basmati rice in India by $185 million in FY '14.[7] (See Dkt. 77,

---

[6] If the latter is true, then plaintiffs should explain why sourcing beyond India would be "immaterial" when APEDA reports exports of Basmati rice from India, not Basmati rice sourced beyond India.

[7] Plaintiffs make no allegations about sales of Basmati rice in India in FY '13. (See, generally, Dkt. 77, SAC).

SAC at ¶ 108). For multiple reasons, plaintiffs allegations fail.

As an initial matter, plaintiffs' allegations that Amira overstated its revenue from Basmati rice sales in India by $185 million lack plausibility under the Twombly/Iqbal standard. This is because, when plaintiffs concluded that Amira's reported revenue from the international sale of Basmati rice was $185.5 million in FY '13 and $187.0 million in FY '14, that should also mean that Amira's reported revenue from sales of Basmati rice in India is $123.7 million in FY '13 and $124.6 million in FY '14. See supra at § I.A.1.

Again relying on the methodology and calculations from Prescience's Reports, plaintiffs explain how they arrive at the $185 million figure. (See Dkt. 77, SAC at ¶ 107). First, Prescience determined that a competitor of Amira, KRBL, has "a 30% market share in the branded Basmati space in India[,]" and revenues of approximately $230 million. (See id.). From this, Prescience assumes that the size of India's market for branded Basmati rice sales is $766.7 million ($230 million ÷ .3 = $766.7 million). Second, Prescience assumes that Amira has a five percent market share for branded Basmati rice sales in India, which is based upon the estimate provided by a confidential KRBL executive. (See Dkt. 77-1, First Report at 11). From this, Prescience contends that Amira's actual sales of branded Basmati rice sales in India is $38 million. (See id.) ($766.7 million x .05 = $38.3 million).

Plaintiffs then compare the $38.3 million branded Basmati rice sales in India to Amira's reported overall revenue in India of $224.1 million in FY '14. (See Dkt. 77, SAC at ¶¶ 107 & 108; Dkt. 96-3, '14 Form 20F at 47). However, this comparison makes little sense because, even if plaintiffs' number of $38.3 million branded Basmati rice sales in India is correct, that number does not correspond to Amira's reported overall revenue in India of $224.1 million, which includes revenues from branded and unbranded products, non-Basmati rice, and other food stuffs like snacks, ready-to-heat meals, and a line of organic product offerings. (See Dkt. 77, SAC at ¶ 43). In short, plaintiffs provide no explanation how Amira could have overstated its revenue from India Basmati rice sales by $185 million – or approximately $56 million more than its total reported sales. (See Dkt. 77, SAC at ¶ 92) ($309.2 million - $185.5 million = $123.7 million in Basmati rice sales in India in FY '13; $311.6 million - $187.0 million = $124.6 million in Basmati rice sales in

India in FY '14). Under the circumstances here, the court is not persuaded that plaintiffs can allege falsity by comparing two numbers that have no common denominator whatsoever.[8]

### 3. **False or Misleading Disclosures as to Related Party Transactions**.

Plaintiffs also allege that Amira did not disclose certain related party transactions.[9] (See Dkt. 77, SAC at ¶¶ 110-143).

#### a. *Karam Enterprises*

Plaintiffs claim that Amira did not disclose the existence of Karam Enterprises, an entity controlled by Chanana's father.[10] (See Dkt. 77, SAC at ¶¶ 111-12). However, the Prospectus disclosed that, prior to the IPO, Amira's subsidiaries "sold and purchased rice, semi-finished rice and palm oil to and from certain affiliates of Mr. Chanana and affiliates of his family members." (Dkt. 96-3, Prospectus at 120). The Prospectus states that "[Amira has] conducted [its] related-party transactions on normal commercial terms that are fair and reasonable and in the interests of [its] shareholders as a whole. [Amira] believe[s] that the terms of [its] related-party transactions are comparable to the terms [it] could obtain from independent third parties." (Id. at 119). The Prospectus further states that it would continue making related party transactions in the future, subject to review by Amira's audit committee. (See id.) ("Subsequent to this offering, we expect that our related-party transactions will continue to be conducted on the same basis. However, upon the completion of this offering, our related-party transactions will be subject to the review and approval of the audit committee of our board of directors.").

---

[8] Comparing the numbers between Amira's SEC filings and APEDA, plaintiffs also suggest that Amira overstated its revenue from sales within the United Arab Emirates ("UAE"). (See Dkt. 77, SAC at ¶¶ 115 & 119). But as explained above, plaintiffs fail to make any like-for-like comparison when comparing Amira's revenues from sales in the UAE and the value of Basmati rice FOB from India. See supra at § I.A.1.

[9] Like the allegations regarding Amira's purported overstatement of revenues, plaintiffs' allegations principally rely on Prescience's First and Second Reports. (See Dkt. 77, SAC at ¶¶ 110-143).

[10] Plaintiffs also allege that Karam Enterprises was once Amira's largest customer, (see Dkt. 77, SAC at ¶ 113), but does not set forth any facts that Karam Enterprises has been Amira's largest customer since Amira's IPO. (See, generally, id.).

In the '13 Form 20F, Amira repeated that it had made related party transactions, subject to review by Amira's audit committee. (See Dkt. 96-3, '13 Form 20F at 79). The '13 FY Form 20F further stated that, "[d]uring fiscal 2013, [Amira's] subsidiaries sold rice, semi-finished rice and palm oil to certain affiliates of Mr. Chanana and affiliates of his family members." (Id.). Also, the '14 Form 20F disclosed that Amira had made related party transactions, subject to review by Amira's audit committee, (see Dkt. 96-3, '14 Form 20F at 77), and disclosed the amounts of those transactions. (See id. at F-39).

A securities fraud complaint based on a purportedly misleading omission must "specify the reason or reasons why the statements made by [the defendant] were misleading or untrue, not simply why the statements were incomplete." Brody v. Transitional Hosps. Corp., 280 F.3d 997, 1006 (9th Cir. 2002). However, plaintiffs do not provide any allegations as to why failing to identify Karam Enterprises rendered Amira's statements materially false and misleading, rather than merely incomplete. (See, generally, Dkt. 77, SAC; Dkt. 105, Opp.).

b. *Affiliated Entities*.

Plaintiffs allege that they have identified 13 additional entities that share: (1) Amira's physical address; (2) Amira's email address; (3) overlapping directors, including Karan Chanana; and (4) the same or similar business as Amira. (See Dkt. 77, SAC at ¶¶ 122-23). Plaintiffs allege that Amira failed to disclose related party transactions with these entities. (See id. at ¶ 130). However, plaintiffs allegations fail because they do not identify any purchases, sales, or any other transaction between Amira, on the one hand, and any of the 13 entities, on the other. (See, generally, id.).

c. *Real Estate Purchase*.

Plaintiffs allege that Amira's January 2015 Form 6K "did not disclose the true ownership and operations of Amira Enterprises, the company that Amira was going to acquire" in order to close a $30 million "sham" real estate transaction. (See Dkt. 77, SAC at ¶¶ 132 & 134). However, plaintiffs' allegations are belied by the January 2015 Form 6K itself, which states:

> [Amira] will apply $30.0 million . . . to acquire Amira Enterprises Private Limited[,] which owns approximately 86 acres of land in Karnal, India

> adjacent to 48.2 acres of land that we have previously purchased. . . . Members of the family of our Chairman, Karan A. Chanana, currently own Amira Enterprises and will receive the proceeds of the sale to Amira Mauritius.

(Dkt. 96-3, Jan. 28, 2015 Form 6K at 2). Thus, contrary to plaintiffs' allegations, Amira did disclose that Amira contemplated purchasing land owned by members of its CEO's family.

d. *Chanana's Personal Expenses*.

Finally, plaintiffs allege that Amira did not disclose that Chanana "uses Amira funds for his personal expense[,]" including paying for "a house manager and chef for Defendant Chanana's farm house." (See Dkt. 77, SAC at ¶ 141). Amira disclosed in its IPO that Chanana's employment agreement entitles him to "reimbursement of business and travel expenses and certain personal expenses incurred in India, including annual living expenses of $120,000." (Dkt. 96-3, Prospectus at 105; see Dkt. 96-3, '13 FY Form 20F at 68; Dkt. 96-3, '14 Form 20F at 66 ("Mr. Chanana is entitled to reimbursement of business expenses and certain personal expenses incurred in India."). Plaintiffs do not allege any facts suggesting that Chanana's incurred expenses exceed $120,000, (see, generally, Dkt. 77, SAC), or that Amira's statements in the Prospectus and Form 20Fs were rendered misleading by omitting to mention that the expenses were used to pay a house manager and chef. See Brody, 280 F.3d at 1006.

In short, plaintiffs have failed to allege, with the particularity required under the Reform Act and Rule 9(b), that the Amira defendants made false or misleading statements in its SEC filings.

B. Scienter.

Like falsity, plaintiffs' allegations regarding scienter must satisfy the heightened pleading requirements of the Reform Act. "To adequately demonstrate that the defendant acted with the required state of mind, a complaint must allege that the defendants made false or misleading statements either intentionally or with deliberate recklessness." Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 991 (9th Cir. 2009), as amended (Feb. 10, 2009) (internal quotation marks omitted). A "strong inference of scienter" means that "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw

from the facts alleged." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 324, 127 S.Ct. 2499, 2510 (2007). When considering scienter, the court "must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." Id. Although "[t]he inference [of scienter] need not be irrefutable, . . . or even the 'most plausible of competing inferences,'" id. at 324, 127 S.Ct. at 2510 (citations omitted) it "must be more than merely 'reasonable' or 'permissible' – it must be cogent and compelling, thus strong in light of other [countervailing] explanations." Id.

Moreover, the court should not merely assess "whether any individual allegation, scrutinized in isolation, meets that standard" of strong inference of scienter. Tellabs, 551 U.S. at 323, 127 S.Ct. at 2509. Rather, the court must consider "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter. Id. (emphasis in original). Consequently, courts often "conduct a dual inquiry: first, [it] will determine whether any of the plaintiff's allegations, standing alone, are sufficient to create a strong inference of scienter; second, if no individual allegations are sufficient, [it] will conduct a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." Zucco, 552 F.3d at 992.

Plaintiffs take several approaches to pleading a strong inference of scienter, but none of them, singly or holistically, meet the pleading requirements of the Reform Act.

1. **Confidential Witnesses**.

"[A] complaint relying on statements from confidential witnesses must pass two hurdles to satisfy the [Reform Act's] pleading requirements. First, the confidential witnesses whose statements are introduced to establish scienter must be described with sufficient particularity to establish their reliability and personal knowledge. Second, those statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of scienter." Zucco, 552 F.3d at 995 (citations omitted).

Plaintiffs rely on the statements of an unidentified former Amira audit committee member who left the board in September 2013. (See Dkt. 77, SAC at ¶ 80). He states his belief that Karam Enterprises, an entity controlled by Chanana's father, is Amira's sole distributor in the

Middle East and some African nations. (See id.). However, even if these statements are reliable, they are not indicative of scienter, since Amira disclosed that it engages in related-party transactions with affiliates and family members of Chanana. (See Dkt. 96-3, Prospectus at 119-20; Dkt. 96-3, '13 FY Form 20F at 79; Dkt. 96-3, '14 FY Form 20F at 76 & F-39).

Plaintiffs also rely on the statements of an unidentified former Amira CFO that are ambiguous, but taken in the light most favorable to plaintiffs, indicate that Amira, like the rest of the rice industry, inflates its inventory to bank loan officers, (see Dkt. 77, SAC at ¶ 76; Dkt. 77-1, First Report at 21), and transfers funds across related entities to manipulate financial statements. (See Dkt. 77, SAC at ¶ 77; Dkt. 77-2, Second Report at 10). Plaintiffs, however, have not pled whether the former Amira CFO's allegations concern conduct and statements before or after the IPO that could render statements in Amira's SEC filings knowingly false or misleading.

In addition to confidential witnesses, plaintiffs rely on statements by Rahul Nayar, Chanana's brother-in-law and a former UBS banker who administered Amira's October 2012 IPO, that: (1) Amira's presence as a brand in India is small, (see Dkt. 77, SAC at ¶ 78); and (2) the rice industry in India generally inflates its inventory to loan officers. (See id. at ¶ 79). Again, even if Nayar's statements are reliable, they are not indicative of scienter. See Zucco, 552 F.3d at 995. Plaintiffs have not explained how Amira's brand presence in India is related to Amira's inflated revenue from sales of Basmati rice internationally or in India. Nor does Nayar contend that Amira itself follows the rice industry by inflating inventory to loan officers.[11]

2. **Core Operations Inference**.

Plaintiffs also rely on the core-operations inference, (see Dkt. 105, Opp. at 24-25), where the court may infer that "facts critical to a business's 'core operations' or important transactions are known to key company officers[.]" S. Ferry LP, No. 2 v. Killinger, 542 F.3d 776, 781 (9th Cir. 2008). The core-operations inference may be relied upon "in rare circumstances where the nature

[11] Plaintiffs also rely on statements from the CFO of Amira's competitor, KRBL, who echoes Nayar's comments that Amira's presence as a brand in India is small. (See Dkt. 77, SAC at ¶ 82). But again, even if the CFO of KRBL's statements are reliable, they are not indicative of scienter, see Zucco, 552 F.3d at 995, because Amira's brand presence in India has nothing to do with whether it inflated revenue from sales of Basmati rice internationally or in India.

of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter." Id. at 776.

Here, plaintiffs have alleged no facts suggesting that it would be absurd for defendants to compare their revenue numbers with APEDA reports and conclude that they did not knowingly make false or misleading statements in their SEC filings. (See Dkt. 77, SAC at ¶¶ 86-92). As explained previously, plaintiffs have failed to make any like-for-like comparison to indicate that defendants' reported revenue is false or misleading. See supra at §§ I.A.1 - I.A.2. Nor have plaintiffs adequately alleged that defendants engaged in related party transactions that were not disclosed in their SEC filings. See supra at § I.A.3.

3. **Group Pleading**.

The SAC also includes allegations that "Defendants were privy to material nonpublic information concerning the Company's business," and because of that access, "knew or recklessly disregarded the fact that the materially adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public." (Dkt. 77, SAC at ¶ 40; see id. at ¶¶ 41 & 42). These general allegations fail because "[a]lthough the Ninth Circuit has not definitively addressed whether group pleading may be adequate in certain instances, courts within the Ninth Circuit have largely concluded that group pleading is not compatible with the [Reform Act's] requirements." In re Am. Apparel, Inc. S'holder Litig., 2013 WL 10914316, *15 n. 143 (C.D. Cal. 2013) (citing cases). "The Central District of California, in particular, appears to be unanimous in this conclusion[.]" Petrie v. Elec. Game Card Inc., 2011 WL 165402, *3 (C.D. Cal. 2011).

/ / /

/ / /

/ / /

4. **Holistic Analysis**.[12]

Finally, based upon the court's holistic review of the subject allegations, see Zucco, 552 F.3d at 992, the court concludes that plaintiffs have failed to allege a strong inference of scienter. Plaintiffs' witnesses, even if reliable, do not make any statements indicating that any defendant had knowledge that any SEC filing contained any untrue statement. Rather, their statements concern matters unrelated to Amira's revenue or related party transactions not already disclosed by Amira in its SEC filings. Nor can plaintiffs rely on the core operations inference, as plaintiffs fail to allege any facts indicating that it would be absurd for any defendant to claim that it had no knowledge of any misrepresentation when comparing the APEDA reports or any other report with Amira's financial statements. Finally, plaintiffs' allegations primarily rely on group pleading, which does not meet the stricter pleading requirements of the Reform Act.

C. Loss Causation.

"Even when deceptive conduct is properly pleaded, a securities fraud complaint must also adequately plead loss causation." Lloyd v. CVB Fin. Corp., 811 F.3d 1200, 1209 (9th Cir. 2016) (internal quotation marks omitted). The requirement of proving "loss causation" in securities fraud cases is akin to the proximate cause requirement of common law deceit or fraudulent misrepresentation claims. See Dura, 544 U.S. at 343-44, 125 S.Ct. at 1632-33; Lloyd, 811 F.3d at 1210 ("Because loss causation is simply a variant of proximate cause, the ultimate issue is whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss.") (internal citation omitted). "Rule 9(b) applies to all elements of a securities fraud

---

[12] Plaintiffs also claim that Chanana, Suneja, Poddar, and Wacha signed the Prospectus, '13 Form 20F, and '14 Form 20F, which is indicative of their state of mind. (See Dkt. 77, SAC at ¶¶ 29, 31, 144 & 158). However, "[b]oilerplate language in a corporation's 10-K form, or required certifications under Sarbanes-Oxley section 302(a) . . . add nothing substantial to the scienter calculus." Zucco, 552 F.3d at 1003-04. "[A]llowing Sarbanes-Oxley certifications [or signatures to other SEC filings] to create an inference of scienter in every case where there was an accounting error or auditing mistake made by a publicly traded company would eviscerate the pleading requirements for scienter set forth in the PSLRA." Id. at 1004 (internal quotations marks and brackets omitted); see In re Am. Apparel, Inc. S'holder Litig., 855 F.Supp.2d 1043, 1085 (C.D. Cal. 2012) (considering defendants' certifications only in the holistic part of the scienter analysis because when assessed individually, signing Sarbanes-Oxley certifications are insufficient to plead scienter).

action, including loss causation." Or. Pub. Emps. Ret. Fund, 774 F.3d at 605.

"To prove loss causation, the Plaintiffs must demonstrate a causal connection between the deceptive acts that form the basis for the claim of securities fraud and the injury suffered by the Plaintiffs." Or. Pub. Emps. Ret. Fund, 774 F.3d at 608 (internal quotation marks and brackets omitted). "Thus, like a plaintiff claiming deceit at common law, the plaintiff in a securities fraud action must demonstrate that an economic loss was caused by the defendant's misrepresentations, rather than some intervening event."[13] Lloyd, 811 F.3d at 1209; see Metzler Inv. GMBH v. Corinthian Colls., Inc., 540 F.3d 1049, 1062 & 1063 (9th Cir. 2008) ("Stated in the affirmative, the complaint must allege that the defendant's share price fell significantly after the truth became known" or was "revealed to the market[.]") (internal quotation marks omitted). "The burden of pleading loss causation is typically satisfied by allegations that the defendant revealed the truth through corrective disclosures which caused the company's stock price to drop and investors to lose money." Lloyd, 811 F.3d at 1209 (internal quotation marks omitted).

1. **Prescience Reports**.

Plaintiffs allege that upon the issuance of Prescience's First Report, Amira's stock closed at $9.95 per share, falling $3.45 per share, or almost 26% from the day before, (see Dkt. 77, SAC at ¶ 9), and on the issuance of Prescience's Second Report, Amira's stock closed at $11.82 per share, falling $1.07 per share, or almost 16% from the day before. (See id. at ¶ 11). However, for the reasons explained above, plaintiffs have failed to allege that anything in the First or Second Reports "corrected" any of Amira's purportedly false or misleading statements or otherwise revealed the truth to the market. Cf. In re Winstar Commc'ns, 2006 WL 473885, *14 (S.D.N.Y. 2006) ("A defendant should not be rewarded by denying defrauded investors recovery simply because the information revealing the alleged fraud was a third party's opinion, notwithstanding the fact such opinion is proven to be true."). None of Prescience's calculations

[13] This is because the "lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price." Dura, 544 U.S. at 343, 125 S.Ct. at 1632.

comparing the APEDA report to Amira's SEC filings, see supra at § I.A.1., or Prescience's calculations regarding Amira's revenue from sales of Basmati rice in India, see supra at § I.A.2., or the statements of its witnesses, see supra at § I.A.3., called into question or rendered untrue any statement by any defendant. See Or. Pub. Emps. Ret. Fund, 774 F.3d at 608 ("The Plaintiffs do not allege specific statements made by the Defendants that were made untrue or called into question by subsequent public disclosures.").

**2. Amira's Announcements Regarding its Late Filing, Termination of its Auditor, and Independent Investigation.**

Plaintiffs allege that Amira's stock price dropped when it filed a Form 12b-25 with the SEC stating that it was unable to file its '15 Form 20F, (see Dkt. 77, SAC at ¶¶ 12-13), announced that it had terminated its auditor, (see id. at ¶¶ 16-17), and its audit committee "elected to appoint an independent external investigative firm." (See id. at ¶ 16) (internal quotation marks omitted). While "the announcement of an SEC investigation related to an alleged misrepresentation, coupled with a subsequent revelation of the inaccuracy of that misrepresentation, can serve as a corrective disclosure for the purpose of loss causation[,]" Lloyd, 811 F.3d at 1203, "the announcement of an investigation, standing alone, is insufficient to establish loss causation." Loos v. Immersion Corp., 762 F.3d 880, 883 (9th Cir. 2014), as amended (Sept. 11, 2014).

Here, plaintiffs have alleged the "announcement of an investigation," Loos, 762 F.3d at 883, but have failed to allege "a subsequent revelation of the inaccuracy of that misrepresentation[.]" Lloyd, 811 F.3d at 1203. Indeed, on January 25, 2016, after retaining a new auditor and after completing an independent investigation, Amira filed its '15 Form 20F.[14] (See Amira's '15 Form

---

[14] In the '15 Form 20F, Amira reported that:

> On November 10, 2015, the Company announced that an Independent Third Party Forensic Investigation had been completed by BDO LLP ("BDO"). The Audit Committee of the Board of Directors of the Company engaged BDO to review certain allegations that had been made against the Company. The review included (I) an analysis of the Company's reported international Basmati sales relative to Amira Pure Foods Private Ltd.'s ("Amira India") exports of Basmati rice, as identified by the Agricultural and Processed Food Products Export Development Authority ("APEDA"); (ii) an analysis of the allegations in respect of the reported Basmati

20-F, available at http://www.sec.gov/Archives/edgar/data/1552448/00011442 0416076738/v429556_20f.htm) (last visited on July 12, 2016). In the '15 Form 20F, Amira's revenue numbers for FY '13 and FY' 14 are identical to the numbers reported in Amira's '13 Form 20F and '14 Form 20F. (See, e.g., Dkt. 96-3, '13 Form 20F at 44 ("Our international sales accounted for $224.8 million, $217.0 million and $157.7 million of our total revenue for fiscal 2013, 2012 and 2011, respectively."); Dkt. 96-3, '14 Form 20F at 42 ("In fiscal 2014, 2013 and 2012, our revenue from international sales was $323.2 million, $224.8 million and $217.0 million, respectively[.]"); '15 Form 20F at 39 ("In fiscal 2015, 2014 and 2013, our revenue from international sales was $413.3 million, $323.2 million and $224.8 million, respectively[.]"). That Amira's revenue numbers have remained unchanged after a new auditor reviewed the papers and the audit committee conducted an independent investigation suggests that there was little, if anything, "corrective" in the Prescience reports. See Harris v. AmTrust Fin. Servs., Inc., 2015 WL 5707235,*14 n. 30 (S.D.N.Y. 2015) ("[T]ime has shown that the GeoInvesting Report did not 'correct' public knowledge about the company. AmTrust has not restated its financial statements. . . . Rather than injecting new information into the market that was absorbed into a corrected stock price, the GeoInvesting Report caused a temporary price drop (which presumably resulted in a pecuniary gain for its author)."); (Dkt. 77-1, First Report at 3 (Prescience's disclosure that it had held a short position in Amira and as such, "st[ood] to realize significant gains in the event that the price of its stock declines."); Dkt. 77-2, Second Report at 3 (same)). In short, even assuming plaintiffs had properly alleged deceptive conduct, they have not adequately pleaded "a causal connection between the material misrepresentation and the loss[.]" See Dura, 544 U.S. at 342,

---

> market size in India; (iii) a comprehensive review of the transactions with the Company's largest customer for fiscal year 2015; (iv) a comprehensive review of the Company's related party transactions with its top customers and named suppliers in fiscal 2014 and fiscal 2015 and; (v) a review to identify the existence of undisclosed revenue transactions with Karam Enterprises since the time of the Company's initial public offering ("IPO"); BDO had independently concluded that these allegations are unsubstantiated and/or unfounded.

('15 Form 20F at F-54).

125 S.Ct. at 1631.

II. SECTION 11 OF THE 1933 ACT.

Section 11 of the 1933 Act creates a private remedy for purchasers of a security if the registration statement "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). "The linchpin of the Act is its registration requirement[;]" "an issuer may offer securities to the public only after filing a registration statement[,]" and "Section 11 of the [1933] Act promotes compliance with these disclosure provisions by giving purchasers a right of action against an issuer or . . . underwriters . . . for material misstatements or omissions in registration statements." Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund, 135 S.Ct. 1318, 1323 (2015). "To prevail in such an action, a plaintiff must prove (1) that the registration statement contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material, that is, it would have misled a reasonable investor about the nature of his or her investment." Rubke, 551 F.3d at 1161 (internal quotation marks omitted). "[T]he buyer need not prove (as he must to establish certain other securities offenses) that the defendant acted with any intent to deceive or defraud." Omnicare, 135 S.Ct. at 1323.

"The particularity requirements of Rule 9(b) apply to claims brought under section 11 when such claims are grounded in fraud." In re Rigel Pharm., Inc. Sec. Litig., 697 F.3d 869, 885 (9th Cir. 2012). "[A] plaintiff's nominal efforts to disclaim allegations of fraud with respect to its section 11 claims are unconvincing where the gravamen of the complaint is fraud and no effort is made to show any other basis for the claims." Id. at 885 & 86 (holding Rule 9(b) applied when plaintiff's § 11 claim "relie[d] on the same alleged misrepresentations from the December 13, 2007 press release that are central to Plaintiff's section 10(b) fraud claim" despite the fact plaintiff "disclaimed in its complaint any allegation of fraud in connection with the section 11 cause of action"). "To ascertain whether a complaint 'sounds in fraud,' [the court] must normally determine, after a close examination of the language and structure of the complaint, whether the complaint alleges a unified course of fraudulent conduct and relies entirely on that course of conduct as the basis of a claim." Rubke, 551 F.3d at 1161 (internal quotation marks and brackets omitted). Where "a

complaint employs the exact same factual allegations to allege violations of section 11 as it uses to allege fraudulent conduct under section 10(b) of the [1934] Act, we can assume that it sounds in fraud." Id.

Here, plaintiffs' allegations sound in fraud despite plaintiffs' disclaimer that "[f]or the purposes of this Section 11 claim, Plaintiff does not allege that any Defendant acted with scienter or fraudulent intent." (See Dkt. 77, SAC at ¶ 234 ) ("This claim is not based on and does not sound in fraud."). Plaintiffs rely on paragraphs 110 to 143 for both their § 10(b) and § 11 claims, which contain allegations that defendant did not disclose related party transactions. (See id. at ¶¶ 110-143 & 233). Plaintiffs also rely on paragraphs 86 to 102 for both their § 10(b) and § 11 claims, which contain allegations that defendants overstated revenue for international sales of Basmati rice. (See Dkt. 77, SAC at ¶¶ 86-102 & 233). Finally, plaintiffs rely on paragraphs 103 to 109 for both their § 10(b) and § 11 claims, which contain allegations that defendants overstated revenue for sales of Basmati rice in India.[15] (See id. at ¶¶ 103-109 & 233). Under the circumstances, the court finds that plaintiffs' § 11 allegations are grounded in fraud and must be pled under the heightened pleading standards of Rule 9(b) of the Federal Rules of Civil Procedure. As the court has concluded that plaintiffs have failed to adequately allege falsity with sufficient particularity, see supra at § I.A., plaintiffs allegations also fail under § 11.

III. SECTION 15 OF THE 1933 ACT AND SECTION 20 OF THE 1934 ACT.

"Section 20(a) and section 15 both require underlying primary violations of the securities laws." In re Rigel Pharm., 697 F.3d at 886 (citing 15 U.S.C. §§ 77o, 78t(a)). Because plaintiffs have failed to adequately plead a violation of the federal securities laws, it follows that plaintiffs have also failed to plead violations of § 20(a) and § 15. See Lloyd, 811 F.3d at 1206 n. 2 (Section 20(a) control person liability claim "rises or falls with the primary violation claim").

IV. LEAVE TO AMEND.

Rule 15 of the Federal Rules of Civil Procedure provides that the court "should freely give

---

[15] Indeed, plaintiffs further contend that because Amira's '13 Form 20F covers the same time period as the Prospectus, "Amira overstated the Company's Basmati rice sales revenue in the 2013 20-F and during this time period." (See Dkt. 77, SAC at ¶ 149).

leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2); see Morongo Band of Mission Indians v. Rose, 893 F.2d 1074, 1079 (9th Cir. 1990) (The policy favoring amendment must "be applied with extreme liberality."). However, "[i]t is settled that the grant of leave to amend the pleadings pursuant to Rule 15(a) is within the discretion of the trial court." Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 330, 91 S.Ct. 795, 802 (1971). This decision is guided by an examination of several factors, including: (1) whether the amendment causes the opposing party undue prejudice; (2) whether the amendment is sought in bad faith; (3) whether the amendment causes undue delay; (4) whether the amendment constitutes an exercise in futility; and (5) whether the plaintiff has previously amended his or her complaint. See DCD Programs, Ltd. v. Leighton, 833 F.2d 183, 186 & n. 3 (9th Cir. 1987).

In the context of private securities litigation complaints, the Ninth Circuit has recognized that, "[d]ue in large part to the enactment of the Private Securities Litigation Reform Act [], plaintiffs in private securities fraud class actions face formidable pleading requirements to properly state a claim and avoid dismissal under Fed. R. Civ. P. 12(b)(6)." Metzler, 540 F.3d at 1054-55. The Reform Act "requires a plaintiff to plead a complaint of securities fraud with an unprecedented degree of specificity and detail giving rise to a strong inference of deliberate recklessness." Eminence Capital, LLC v. Aspeon, Inc., 316 F.3d 1048, 1052 (9th Cir. 2003) ("In this technical and demanding corner of the law, the drafting of a cognizable complaint can be a matter of trial and error") (internal quotation marks omitted).

Given the very high pleading standards that plaintiffs must meet in order to adequately state a federal securities claim, the court will give plaintiffs another opportunity to state a claim. Plaintiffs should carefully and thoroughly review and revise the SAC, as this will be plaintiffs' fourth opportunity to state a claim and the court will not be inclined to grant any further opportunities to amend. Since plaintiffs filed the SAC, Amira retained a new auditor and completed an independent investigation that examined the charges alleged by plaintiffs in the operative complaint. (See '15 Form 20F at F-54; supra at § I.C.2.). The result of these actions resulted in Amira filing a '15 Form 20F that did not revise the revenue numbers provided in the '13 Form 20F and '14 Form 20F. (Compare Dkt. 96-3, '13 Form 20F at 44-48 with Dkt. 96-3, '14 Form 20F at

41, 42, 46, 47 & 49 and with '15 Form 20F at 39, 44-47) (providing identical revenue from sales across years). In preparing their third amended complaint, plaintiffs must explain how the statements in Amira's Prospectus, '13 Form 20F, and '14 Form 20F were false or misleading despite the intervening events that have since transpired.

## CONCLUSION

**This Order is not intended for publication. Nor is it intended to be included in or submitted to any online service such as Westlaw or Lexis.**

Based on the foregoing, IT IS ORDERED THAT:

1. Defendants' Amira Nature Foods Ltd., Karan A. Chanana, Bruce C. Wacha, Ritesh Suneja, and Ashish Poddar's ("Amira Defendants") Motion to Dismiss Second Amended Complaint (**Document No. 96**) is **granted**.

2. The Underwriter defendants' Joinder in Amira Defendants' Motion and Motion of Underwriter Defendants to Dismiss Second Amended Complaint (**Document No. 100**) is **granted**.

3. The SAC is dismissed with leave to amend. If plaintiffs still wish to pursue this action, they are granted until **August 4, 2016**, to file a Third Amended Complaint attempting to cure, to the extent they believe is warranted by existing law, the defects outlined in this Order. The amended complaint must be labeled "Third Amended Complaint," filed in compliance with Local Rule 3-2 and contain the case number assigned to the case, i.e., Case No. CV 15-0957 FMO (PJWx). In addition, plaintiffs are informed that the court cannot refer to a prior pleading in order to make the Third Amended Complaint complete. Local Rule 15-2 requires that an amended pleading be complete in and of itself without reference to any prior pleading. This is because, as a general rule, an amended pleading supersedes the original pleading. See Ramirez v. Cnty. of San Bernardino, 806 F.3d 1002, 1008 (9th Cir. 2015) ("It is well-established in our circuit that an amended complaint supersedes the original, the latter being treated thereafter as non-existent. In other words, 'the original pleading no longer performs any function[.]'") (citations and internal quotation marks omitted).

4. In the event one or more defendants wish to file another motion to dismiss, then counsel

for the parties shall, on **August 11, 2016, at 10:00 a.m.**[16] meet and confer in person at an agreed upon location within the Central District of California to discuss defendants' motion(s) to dismiss. Defendants' motion(s) must include copies of all meet and confer letters as well as a declaration that sets forth, in detail, the entire meet and confer process (i.e., when and where it took place, how long it lasted and the position of each attorney with respect to each disputed issue that will be the subject of the motion). Failure to include such a declaration will result in the motion(s) being denied.

5. Plaintiffs are cautioned that failure to timely file a Third Amended Complaint may result in this action being dismissed without prejudice for failure to prosecute and/or failure to comply with a court order. See Fed. R. Civ. P. 41(b); Link v. Wabash R.R. Co., 370 U.S. 626, 629-30, 82 S.Ct. 1386, 1388 (1962).

6. Defendants shall file their answer or motion to the Third Amended Complaint or a motion pursuant to Fed. R. Civ. P. 12 no later than **August 18, 2016**.

Dated this 18th day of July, 2016.

/s/

Fernando M. Olguin
United States District Judge

[16] Counsel may agree to meet and confer at another time and place without seeking court approval for such an agreement.